**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2004-KA-00961-SCT**

*CHRIS JONES*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 04/29/2004 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH, III |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ALLAN D. SHACKELFORD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOHN R. HENRY |
| DISTRICT ATTORNEY: | LAURENCE Y. MELLEN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/30/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE COBB, P.J., CARLSON AND GRAVES, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     On February 14, 2001, a Tunica County grand jury indicted Chris Jones for the murder of his girlfriend, Jennifer Stewart.  A subsequent trial resulted in the jury finding Jones guilty of murder, and the judge forthwith sentenced Jones to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections.[1]     After the circuit judge denied his

---

[1]Even though the indictment was handed down in early 2001, this case was not called up for trial until April 27, 2004.  There were several reasons for this unusually long delay between indictment and trial, including continuances at the request of either the defendant or the State, changes in trial attorneys for both the defendant and the State, extensive discovery, and the retaining of experts by the State and the defendant.

post-trial motions, Jones perfected his appeal to this Court alleging several trial court errors. Finding Jones's assignments of error to be without merit, we affirm the trial court judgment of conviction and life sentence.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     The evidence in this murder case is purely circumstantial inasmuch as there is no confession from Jones, nor are there any eyewitnesses to the crime. We first present the facts as gleaned from the testimony of the State's witnesses at trial.

¶3.     On February 15, 2000, Chris Jones, an employee of Fitzgerald's Casino in Tunica County, Mississippi, clocked in for work at 3:57 p.m., and clocked out at 10:34 p.m.  Jones and his girlfriend, Jennifer Stewart, lived in Buck Island Trailer Park, which was only a five to ten minute drive from Fitzgerald's.  At 11:29 p.m., the Tunica County Sheriff's Department received a 911 call from Jones stating that he had discovered a possible homicide at his residence, and Dwight Woods, a Tunica County deputy sheriff, was immediately dispatched to Jones's residence at 308 Buck Island Trailer Park.  When Deputy Woods arrived at Jones's residence, Woods found Jones standing outside his trailer covered in blood and crying.  Woods immediately handcuffed Jones and placed him in the back of his patrol car.  Woods then radioed for backup, which resulted in the subsequent arrival of several law enforcement officers, including Eugene Payne, who at the time was a Lieutenant in charge of investigations for the Tunica County Sheriff's Department.[2]  Woods and a Deputy McCulk, went inside the

_____

[2]By the time of trial, Payne had been promoted to Major and was serving as Jail Warden.

2

trailer to secure the scene, and discovered a female, later identified as Jennifer Stewart, lying face up "on the bed partially on the floor" with a camisole-like garment halfway up her back and "blood all over the place." In addition to Stewart being covered in blood, Woods and McCulk saw blood "all over the house, the kitchen, on the door, on the floor, and the door knob." In the bedroom where Stewart was found, there were "just bloodstains everywhere."

¶4. Upon arriving at the scene, Lt. Payne observed a handcuffed male, whom he quickly learned to be Jones, in the back seat of Woods's patrol car. Once Jones was removed from the patrol car, Payne noticed blood on Jones's tee shirt, both upper legs of his jeans, and his shoes. Payne also went inside the trailer and observed Stewart and the large amount of blood throughout the trailer. Payne gathered evidence at the crime scene, including Jones's tee shirt, which he placed into an evidence bag.[3] This tee shirt was later analyzed by Christie Smith, a forensic scientist assigned to the serology section at the Mississippi Crime Laboratory. Smith positively identified a stain on Jones's tee shirt to be human blood which covered an area from the neck of the shirt down to the belly button.

¶5. Dr. Steven Hayne, a forensic pathologist who has performed over 25,000 autopsies, opined that the manner of death for Stewart was homicide, and that the cause of death was internal bleeding as a result of two lethal stab wounds consistent with a knife or box cutter.[4] One of the lethal stab wounds was in the lower mid-chest wall, and the other lethal stab wound

---

[3]No murder weapon was ever found.

[4]Stewart had been stabbed six times, but Dr. Hayne testified four of those stab wounds were non-lethal.

was in the right side of the back. Two of the non-lethal stab wounds were to the left side of the back, and the two remaining non-lethal stab wounds were to the right side of the back. Grant Dale Graham, Sr., a Senior Crime Scene Analyst and Crime Scene Team Leader with the Biloxi Crime Laboratory, specializing in bloodstain pattern analysis, examined Jones's tee shirt and opined that the blood transfer pattern on the tee shirt was consistent with a blood transfer pattern appearing on a bandana found around Stewart's neck at the crime scene. From this observation, Graham concluded "that at sometime this shirt made contact with this portion of the scarf and that the contact was made in the upper area of the chest where the stain is on the tee shirt." Graham further opined that a portion of the front of Jones's tee shirt contained blood stains consistent with the shirt being in close proximity to a medium velocity and/or cast off event commonly associated with blunt force trauma or a stabbing incident.[5]

¶6. Mary Lancaster, a cook at Harrah's Casino in Tunica, knew Jones when he had previously worked at Harrah's as a steward in her area, and she also identified Stewart from a photograph.

¶7. The defendant had his own bloodstain analysis expert in Paul Kish, an independent forensic consultant and an adjunct professor at Elmira College in Elmira, New York.[6] There

---

[5]In general terms relating to blood pattern analysis, a cast off pattern occurs when blood is affixed to an object or surface from waving a bloody object, i.e., a hand or a knife. A transfer pattern occurs when a bloody object touches another object, i.e., a bloody shirt touching a scarf. An impact blood stain or pattern occurs when a high velocity object strikes with such significant force so as to cause the blood to spatter, i.e., stabbing a person with a knife.

[6]Lt. Payne preceded Kish as a witness in the defendant's case in chief in order to confirm the time that the pictures were taken at the crime scene (12:10 a.m.), and the fact that Stewart was turned over that at the scene. This testimony was for the purpose of laying a predicate for a portion of Kish's testimony.

was at least one major disagreement between Kish and Graham. The blood stain on the shirt which Graham described as a spatter caused by blunt force trauma, Kish categorized as a transfer pattern which would be consistent with Jones picking up Stewart and placing her on the bed while she was bloody.[7]

¶8.　　After receiving the instructions from the trial court, which included a circumstantial evidence instruction, and after hearing the attorneys' closing arguments, the jury retired to deliberate and in due course returned a verdict finding Jones guilty of the murder of Stewart. After imposing a life sentence and subsequently denying Jones's motion for judgment notwithstanding the verdict, or in the alternative, a new trial, Jones timely perfected his appeal to this Court, alleging that (1) the trial court erred in allowing expert opinion testimony concerning blood spatter; (2) the trial court erred in refusing to admit the coroner's report into evidence; (3) there was insufficient evidence to sustain a guilty verdict; and, (4) the guilty verdict was against the overwhelming weight of the evidence.

## DISCUSSION

### I.　　WHETHER THE TRIAL COURT ERRED IN ALLOWING EXPERT TESTIMONY CONCERNING BLOOD PATTERNS.

_____

[7]Graham was called briefly in the State's rebuttal to dispute Kish's testimony.

5

¶9. Our well-established standard of review for reviewing the trial court's admissibility of evidence, including expert testimony, is abuse of discretion. *Miss. Transp. Comm'n v. McLemore*, 863 So.2d 31, 34 (Miss. 2003); *McGowen v. State*, 859 So.2d 320, 328 (Miss. 2003); *Haggerty v. Foster*, 838 So.2d 948, 958 (Miss. 2002). Unless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the accused in a criminal case, we will affirm the trial court's ruling. *McGowen*, 859 So.2d at 328.

¶10. Turning to the evidence in today's case, the tee shirt has continuously been the focus of Jones's attention by way of written pre-trial motions, at pre-trial suppression hearings, during the trial, and after the trial through post-trial motions and on appeal to this Court. The trial judge did not rush to judgment on the admissibility of the shirt. At an evidentiary hearing on the issue of the admissibility of the tee shirt just moments before Graham was to be called to the witness stand to testify on the third day of trial, the trial court allowed the shirt into evidence, over the objection of defense counsel.

¶11. On appeal, Jones argues that the trial court committed reversible error in allowing Grant Graham, the State's expert, to testify about the stain patterns on the shirt because Graham could do nothing more than assume that the stains were in fact blood stains. Jones claims that there was "only a very small spot on the front of the tee shirt [which] tested positive for human blood." Jones likewise asserts that one of the areas of the shirt about which Graham testified as to stain patterns had been tested and determined to be inconclusive as to the existence of

6

human blood. Finally, Jones argues that no DNA testing was done to "link the stain on the tee shirt to the murder victim."

¶12. To address this issue, we must go deeper into the record and read together the testimony of Christine Smith, the Crime Lab serologist, and Grant Graham, the bloodstain pattern analyst. Since this is a circumstantial evidence case, and since the testimony of Smith and Graham is critical to this case, we feel compelled to quote extensively from the record. Regarding her examination and testing of Jones's tee shirt, Smith testified:

> A. First of all, I took the actual bag, cut it open, removed the item; made some documentation regarding what the item was, which is a white tee shirt. Then I made some notes as to where any reddish brown stains were located on the shirt. Did a – performed a screening test which tells us that certain stains might be blood, if it's positive. Once I performed that test, I then cut out on the stains. Which you can see here, I've removed them from the tee shirt. And did further testing to determine if in fact they were human blood or not. And in this particular case, I did cut those stains out and identified human blood on the front of this tee shirt.
>
> ************
>
> A. On the front of this tee shirt, I've marked an area called "T-3," and that just means test site three. With each particular area of the shirt, I start with one and then number the stains sequentially after that. And T-3, which would be this general area on the front of the tee shirt just below the neck, from those stains that I cut out, that blood was actually identified in that particular area.
>
> ************
>
> A. Where you see the holes cut out on the front of this tee shirt just below the neck, human blood was identified in this area. And you can still see some of the reddish brown stains that were left out on the tee shirt that I did not cut out.
>
> ************
>
> A. Uhm, you're referring to another cutout area just below where I've marked T-3, and that's just another area of that particular test site. So I basically tested this large giant area here.
>
> Q. And that was blood?

7

A. Yes. Now, what you were referring to down here is another test site located on the front bottom seam, and I labeled that test site four. It did screen positive, which means it might be blood. But based on the stain from T-3, I just used that, because it was more concentrated and identified human blood and *there was really no need to continue to identify blood over and over on the tee shirt*.

\*\*\*\*\*\*\*\*\*\*\*\*

Q. So, would it be your expert opinion, based on a reasonable degree of forensic certainty, that this area from the neck all the way down to, say, the belly button would be covered with blood?

A. Uh, I would say that there was definitely human blood in that particular area that you're referring to.

(emphasis added).

¶13. Smith likewise testified that she cut out other parts of the shirt and that one area which she tested was inconclusive for human blood, and she attributed the inconclusiveness of the test to the stain "not being concentrated enough to give positive results." Smith likewise testified that the other cut outs screened positive, meaning that "it might be blood," but she saw no reason to perform further testing because of the positive test results she had already obtained. Smith further testified that Jones's pants tested positive for human blood, as well as two door knobs. Jones's shoes and a box cutter had insufficient stains to test further "and still have some left for possible DNA testing." Also, two other door knobs had no blood on them. On cross-examination, Smith testified as to why she did not test each of the twelve cut outs from the shirt.

Q. And how many spots on the front of that tee shirt did you have a positive identification of blood?

A. One.

8

Q. What was the purpose of cutting the others out?

A. Uh, because of the way that the stains are on the tee shirt, they are, I would say, light to medium in color. I took a larger portion of that particular stain so I would have plenty for human testing and then for any subsequent testing.

************

Q. What was the purpose of cutting T-3 out?

A. Uh, because what I did is took this general area and if the stain looked similar in color and consistency to the stain at the top of the tee shirt, I considered this one area.

Q. Oh, I see. You just assumed that what was down here was the same down on the lower part as what was up on the upper part of the chest area, is that right?

A. Based on the color and consistency of the stain, yes.

Q. All right. Did you tell me that on the sleeve area you found human blood?

A. Uh, that stain I screened but did not test further.

Q. Well, what was the purpose of cutting it out, if you weren't going to test it?

A. Well, when I look at the item and I mark them with the test site numbers, screen it, if they are all positive, I cut out everything that's positive. Then when I go to determine whether it's human blood, I evaluate the stains and take the best stain as far as concentration and color, and do further testing on it.

Smith testified that to her knowledge, no DNA testing was performed.

¶14. We now turn to the testimony of Grant Graham, who specializes in crime scene analysis and bloodstain pattern analysis as part of his duties with the Biloxi Crime Lab. Graham also examined and tested Jones's tee shirt. Graham concluded that there were transfer patterns of bloodstains on Stewart's bandana (scarf) which were consistent with the transfer patterns found in the upper chest area on the front of Jones's tee shirt. Graham also testified that his

9

examination of the shirt caused him to conclude that certain bloodstains on the shirt were consistent with a medium velocity or cast off event associated with blunt force trauma or stabbing incident. It is readily apparent that Jones believes the following testimony from Graham undergirds his argument that Graham's opinions are based on conjecture, suspicion, and assumptions. During the cross-examination of Graham, we find this colloquy: Q. All right. Now, I believe that you're not a serologist, are you?

A. No, I'm not. No.

Q. So you have to defer to the serologist as to whether this is bloodstain or other stain, do you not?

A. Yes.

Q. And assuming that – well, strike that. When you look at a stain, you are assuming that it is blood, is that right?

A. No. I have – I look at a stain. It's a red stain. It just – visually, if I look at a stain and it visually looks like blood to me, I will do a bloodstain pattern analysis of it. The determination of whether or not the stain is blood is made by a serologist, not by me. For instance, if I get a shirt that has red staining similar to what we have in this case, as well as purple stains that look like it could come from an ink pen that may have broken or something, obviously the stains that appear to be ink are something that unless the pen was used as a weapon, I wouldn't be concerned with those kind of stains. I would be concerned with the stains that appear to be blood.

Q. Okay, then let me go a step further. If it's a red stain, you view it as – and you are – when you are analyzing that stain, you assume that it is blood for the purposes of your analysis, is that right? To see – when you are looking to see what shape it is and that – and the, uh — to see whether it's cast off or not, you assume it's blood?

A. Well, now, to say that I assume it's blood, I think is not the proper word for it.

Q. What would be the proper word?

10

A. It is possibly blood. Again, I don't know it's blood until it's been tested by a serologist. If a stain looks like blood visually to me, then I will do a bloodstain pattern analysis of it. If the serologist does a test and it doesn't turn out to be blood, at least I've done my analysis properly. That's my job.

Q. That's my point, when you look at – when you do your analysis, you are doing it as though it is blood?

A. Yes.

¶15. In the trial of any criminal case, much less a circumstantial evidence case, the jury has to put the evidence together like pieces of a jigsaw puzzle, and in the end, view the evidence as a whole. By the time that Graham testified before the jury as to his bloodstain pattern analysis regarding, among other things, Jones's shirt, the jury had already heard extensive testimony from Smith, the serologist, regarding the human blood she found on Jones's shirt. Neither this Court, nor the jury, is required to view the evidence in a vacuum.

¶16. Effective May 29, 2003, this Court amended Miss. R. Evid. 702 to clarify the gate-keeping responsibilities of our trial courts in evaluating the admissibility of expert testimony. Our current Rule 702, which is now identical to Fed. R. Evid. 702, states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The comment to this amended rule clearly reveals this Court's effort to address the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[8]  Thus, after years of applying the *Frye*

standard[9] on the issue of the admissibility of expert testimony, we now apply the *Daubert*

standard.  *See, e.g.*, *Hughes v. State*, 892 So.2d 203, 210 (Miss. 2004) (fn 1); *Janssen*

*Pharmaceutica, Inc. v. Bailey*, 878 So.2d 31, 60 (Miss. 2004); *Janssen Pharmaceutica, Inc.*

*v. Armond*, 866 So.2d 1092, 1103 (Miss. 2004) (Graves, J., specially concurring); *Mississippi*

*Transp. Com'n v. McLemore*, 863 So.2d 31, 35-40 (Miss. 2003); *McGowen v. State*, 859

So.2d 320, 340-41 (Miss. 2003).

¶17.   In *McLemore*, we acknowledged that under the *Frye* standard:

> "[I]t is not necessary that one offering to testify as an expert be infallible or
> possess the highest degree of skill; it is sufficient if that person possesses
> peculiar knowledge or information regarding the relevant subject matter which
> is not likely to be possessed by a layman."

863 So.2d at 36 (citing *Kansas City S. Ry. v. Johnson*, 798 So.2d 374, 382 (Miss. 2001)

(quoting *Hooten v. State*, 492 So.2d 948 (Miss. 1986)).

---

[8]The comment states in pertinent part:

> By the 2003 amendment of Rule 702, the Supreme Court clearly recognizes the gate keeping
> responsibility of the trial court to determine whether the expert testimony is relevant and
> reliable.  This follows the 2000 adoption of a like amendment to Fed.R.Evid. 702 adopted in
> response to *Daubert v. Merrell Dow Pharmaceuticals, Inc*. 509 U.S. 579 (1993).  It is
> important to note that Rule 702 does not relax the traditional standards for determining that
> the witness is indeed qualified to speak an opinion on a matter within a purported field of
> knowledge, and that the factors mentioned in *Daubert* do not constitute an exclusive list of
> those to be considered in making the determination: *Daubert's* "list of factors was meant to
> be helpful, not definitive."  *Kuhmo* [*Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)],
> 526 U.S. at 151. See also *Pepitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002).

[9]*Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923).

¶18. In adopting the ***Daubert*** test concerning expert testimony, we stated in ***McLemore*** that our state trial courts perform a critical gatekeeping role in addressing the admissibility of expert testimony, but that this role does not replace the adversary system. 863 So.2d at 39. There is a two-pronged inquiry which the trial court must perform in making a determination as to whether expert testimony is admissible, in that the trial court must first determine if the proffered testimony is relevant, and if relevant, then is the proffered testimony reliable. ***Id.*** at 38. We acknowledged that ***Daubert*** provides a "non-exhaustive, illustrative list of reliability factors" to aid the trial courts in exercising their discretion to determine whether expert testimony is admissible. ***Id.*** at 36. *See **Daubert***, 509 U.S. at 592-94. Finally, in ***McLemore***, we stated:

> The gatekeeping function of the trial court is consistent with the underlying goals of relevancy and reliability in the Rules. ***Daubert*** ensures that the relevancy requirements of the rules are properly considered in an admissibility decision. Rule 702 gives the judge "discretionary authority, reviewable for abuse, to determine reliability in light of the particular facts and circumstances of the particular case." ***Kumho Tire***, 526 U.S. at 158, 119 S.Ct. 1167.
>
> We are confident that our learned trial judges can and will properly assume the role as gatekeeper on questions of admissibility of expert testimony. The modified ***Daubert*** test does not require trial judges to become scientists or experts. Every expert discipline has a body of knowledge and research to aid the court in establishing criteria which indicate reliability. The trial court can identify the specific indicia of reliability of evidence in a particular technical or scientific field. Every substantive decision requires immersion in the subject matter of the case. The modified ***Daubert*** test will not change the role of the trial judge nor will it alter the ever existing demand that the judge understand the subjects of the case, both in terms of claims and defenses. We are certain that the trial judges possess the capacity to undertake this review.

863 So.2d at 39-40.

¶19. The record in today's case clearly reveals that the trial judge was acutely aware of his responsibilities under **Daubert**, and our this Court's decision in **McLemore** and its progeny. Prior to the commencement of the court proceedings on the third day of trial, defense counsel again objected to the testimony of Graham, who was about to be called to the witness stand in open court. Outside the presence of the jury, when this issue was brought to the trial judge's attention, he stated "let's go straight into a Daubert hearing." With the jury out, Graham took the witness stand and was questioned by counsel for the State and Jones. After the proffer, the following occurred:

> BY THE COURT: For the record, the Daubert hearing has been held. The defense attorney has spoken with the blood spatter expert and has an objection for the record. Mr. Shackelford.

> BY MR. SHACKELFORD: Your Honor, to exclude all evidence of all stains with the exception – on the tee shirt with the exception – or any of the clothing, with the exception of that designated as 9T3E, which is a cutting from the chest area, that being the only cutting which was confirmed to be blood by the serologist, Christie Smith, and in my conference with Mr. Graham, he tells me that he has to defer to the serologist because he is not one.

The trial court denied defense counsel's motion in limine to exclude the blood spatter testimony on the grounds that Graham's testimony was based on the assumption that the stains on the shirt were in fact human blood. In applying **Daubert** to the facts and circumstances peculiar to the case sub judice, the trial court quite appropriately denied Jones's motion to exclude Graham's testimony, which was relevant and reliable as to his bloodstain analysis of the stains on Jones's tee shirt, which had by that time been identified by Christie Smith before the jury as human blood. In our adversary system of justice, Jones, through counsel, was able

14

to extensively cross-examine both Smith and Graham as to their testimony, including their opinions and conclusions. Graham readily admitted on cross- examination that if the serologist determined that certain stains he tested turned out not to be human blood, then so be it, because he had done his job. In other words, in today's case, it was Smith's "job" to determine if the stains were "human blood" and it was Graham's "job" to analyze the stain patterns on the shirt and come to conclusions as to how they got there. Again, no case is tried in a vacuum.

¶20.    The jury had every right to believe or disbelieve any part of, or all of, the testimony of Smith and/or Graham. This same right existed as to Jones's expert testimony offered through Paul Kish. The trial court properly instructed the jury, inter alia, that the jury's duty was to determine the facts from the evidence which had been presented in open court, and that the jury could exercise its discretion in determining what weight and credibility to assign to the testimony and any supporting evidence of each witness who had testified in the case. Concerning expert testimony, the trial court also instructed the jury via Instruction No. C-24, which stated in pertinent part:

> You will recall that individual(s) has/have testified as (an) expert(s) in this case. You should consider each expert opinion received in evidence in this case and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, then you may disregard the opinion entirely.

Thus, the jury was more than adequately instructed by the trial court that if the jury felt that Smith was mistaken or simply wrong in her opinion regarding the presence of human blood on

15

Jones's tee shirt, and/or that Graham was basing his blood pattern analysis on the erroneous belief or unsubstantiated assumptions that the stains were that of human blood, then the jury could disregard this expert testimony in its entirety. If the jury felt that Kish's testimony was more credible than that of Graham, then the jury certainly could have accepted Kish's testimony that one of the blood stains was a transfer pattern consistent with Jones merely picking up Stewart and placing her on the bed while she was bloody, thus supporting Jones's theory that he discovered the homicide and was moving Stewart to the bed upon discovering her body. By its verdict of guilty, the jury obviously chose to accept the State's expert testimony, which had been admitted by the trial court in performing its gatekeeping role under *Daubert*.

¶21. For these reasons, we find that the trial court did not commit error in allowing Grant Graham's expert testimony concerning blood patterns on Jones's tee shirt. Thus, this assignment of error is without merit.

## II. WHETHER THE TRIAL COURT ERRED IN NOT ALLOWING THE CORONER'S REPORT INTO EVIDENCE.

¶22. Jones next asserts trial court error in not allowing him to introduce into evidence the coroner's report. Bart J. Cowart, the duly-elected Tunica County coroner who went to the crime scene and subsequently prepared a coroner's report, died prior to trial.[10] Jones attempted to introduce the coroner's report into evidence to show to the jury that Cowart had

---

[10]Throughout the transcript, the coroner's surname is spelled "Coward," however, we note from his signature on the coroner's report that the coroner's surname is "Cowart."

estimated the time of Stewart's death to be 9:30 p.m., which if accepted by the jury, would provide Jones with an alibi since the evidence is undisputed that Jones did not clock out from work at Fitzgerald's until 10:34 p.m. Indeed, there is a joint stipulation to this fact.

¶23. At the time that the State rested its case in chief, and prior to presenting his case in chief, Jones requested an evidentiary hearing on the issue of the coroner's report, and this hearing was granted by the trial court outside the presence of the jury. There was a stipulation that the Report of Death Investigation by Coroner, marked for identification as exhibit D-1, was a true and correct copy of the report completed by Cowart in his duties as coroner, and that the original of this report was on file with the State of Mississippi as a public record. Jones, through counsel, offered to redact much of the objectionable portions of the coroner's report, informing the trial judge that he wanted the report before the jury to place the time of death at 9:30 p.m. and to inform the jury of the state of rigor mortis.

¶24. Dr. Hayne had also testified as to rigor mortis – a stiffening of the body after death. We quickly lay to rest the arguments between the State and Jones as to Dr. Hayne's testimony regarding the occurrence of rigor mortis as to Stewart. We agree with Jones's assessment of Dr. Hayne's testimony. Though the State tried mightily to pin Dr. Hayne down on a lesser time, a fair reading of Dr. Hayne's testimony reveals that his opinion was that rigor mortis in Stewart's case took two to four hours.[11] Dr. Hayne's opinion was based at least in part on some

---

[11]The State argued that the record revealed that Dr. Hayne estimated rigor mortis would have occurred in one to three hours. However, the record is devoid of any testimony from Dr. Hayne that there was a medical probability that rigor mortis would have occurred during this time frame. We admit that the attorneys argued this to the trial court, but Dr. Hayne did not so testify. In fact, several times on both direct examination and re-direct examination, the prosecutor attempted to get Dr. Hayne to agree that instant rigor

17

of the photographs taken at the scene at approximately 12:10 a.m., on February 16, 2000.[12] Viewing this testimony in the light most favorable to the State, Stewart's death would have occurred no later than 10:10 p.m., and even as early as 8:10 p.m., meaning that under either scenario, Jones was still at work at the time of Stewart's death. Additionally, according to Jones, if the coroner's report had been allowed into evidence, the jury would have had for consideration the coroner's estimated time of death of 9:30 p.m., again a time at which Jones was still at work.

¶25. On cross-examination, Dr. Hayne was questioned about the time of death and he stated that although it was not routine for him to be requested to arrive at a time of death, he certainly could arrive at an opinion as to the time of death if so requested. Dr. Hayne testified as to the protocol he followed if requested to offer an opinion as to the time of death:

> If time of death is requested, then multiple variables, that I indicated would be employed. Looking at the rigor mortis, livor mortis at the scene. Also, at the autopsy table, gastric contents analysis, as well as other variables could be employed to determine the time of death. No single variable is commonly used to make that determination. Usually, it's a compiling of different pieces of information, when last seen, when discovered, condition of the body, any decomposition, rigor mortis, livor mortis, algor mortis, gastric contents, and the like. And then one actually establishes a window, as opposed to a specific time.

mortis (immediate stiffening of the body upon death) was probable in this case. Dr. Hayne would not bite – he said that instant rigor mortis "would be possible, though it would be very rare to have that occur." In fact on cross-examination, Dr. Hayne said that it was possible that instant rigor mortis would occur in less than one percent of the cases. Even when the prosecution attempted to have Dr. Hayne agree with the premise that in Stewart's case, rigor mortis could have occurred within 45 minutes to an hour after death, Dr. Hayne would only say "[i]t's possible."

[12]The seven photographs actually received into evidence were marked Exhibits 2a, 2b, 2d, 2e, 2f, 2i, and 2j. Four of the photographs depict the victim lying on her back in the bed, as she was found by law enforcement officials, and the remaining three photographs depict Stewart as she appeared, after the officials at the scene rolled her over on her stomach to photograph the stab wounds to her back.

18

Dr. Hayne did not offer an opinion as to the time of Stewart's death.

¶26. In its effort to keep the coroner's report out of evidence, the State called Jesse Luwers Powell, Jr., to testify at the evidentiary hearing in order to make a proffer outside the presence of the jury. Powell was a Tunica County criminal investigator assigned to the District Attorney's Office, and he also served as the County's deputy coroner. We learn from Powell that the duly elected Tunica County Coroner, Bart J. Cowart, died between the time of his investigation at the crime scene and the trial of this case. Powell, as deputy coroner, testified as to the duties and qualifications of a coroner, that Cowart did not have a medical degree, and that a coroner is unable to arrive at an exact time of death.

¶27. Jones argues that the coroner's report, at least as to the estimated time of death, is admissible as a public record pursuant to Miss. R. Evid. 803(8), based on Miss. Code Ann. §§ 19-21-105(2) & 41-61-63. Miss. R. Evid. 803(8) states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> ************
>
> **(8) Public Records and Reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the state in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Miss. Code Ann. § 19-21-105(2) provides for the duly elected coroner, upon completion of the death investigation training school, to be designated the chief county medical examiner or

19

chief county medical examiner investigator, as provided by Miss. Code Ann. § 41-61-57(2). Section 41-61-63(2)(b) does indeed state that the medical examiner's certificate of death shall include, among other things, the date and time of death as well as the cause of death.

¶28.   To support his argument regarding the admissibility of the coroner's report, Jones relies on *Campbell v. State*, 798 So.2d 524 (Miss. 2001), and *Luster v. State*, 515 So.2d 717 (Miss. 1987); however, these cases are clearly distinguishable.   In *Campbell*, we stated that "[t]he coroner placed the time of death between 4:30 p.m. and 5:30 p.m." 798 So.2d at 526. We also acknowledged that the State had proved that the murder victim's time of death was between 4:30 p.m. and 5:30 p.m.   *Id.* at 529.   However, the admissibility of this evidence was not questioned, plus we know not as to how this evidence was received, i.e., whether this evidence was received through the coroner's testimony at trial, the coroner's report, by stipulation, or some other method.   In *Luster*, the death certificate and medical examiner's report were admitted into evidence by stipulation, thus once again, there was no issue as to admissibility.  515 So.2d at 1180.

¶29.   On the other hand, the trial court in today's case relied on *Redhead v. Entergy Mississippi, Inc.*, 829 So.2d 801 (Miss. Ct. App. 2001), in which a unanimous Court of Appeals held that the trial court did not err in excluding from evidence under Miss. R. Evid. 803(8), a county forester's report reflecting the cause of the fire which damaged the plaintiff's tree farm.  The plaintiff in *Redhead* relied on *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), which interpreted Fed. R. Evid. 803(8)(c).  Our state

Rule 803(8) is identical to the federal Rule 803(8), except for the phrase "the state" appearing in the state rule, and the phrase "the Government" appearing in the federal rule. In *Beech Aircraft*, the United States Supreme Court stated that certain portions of investigative reports would not be inadmissible simply because they might contain conclusions or opinions so long as "the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement." 488 U.S. at 170, 109 S.Ct. at 439. *See Redhead*, 828 So.2d at 809. The plaintiff in *Redhead* argued that the Court of Appeals should apply the *Beech Aircraft* analysis since the state rule was modeled after the federal rule. In applying both the *Beech Aircraft* analysis and Miss. R. Evid. 803(8)(C), the Court of Appeals opined that portions of the forester's report lacked trustworthiness and were thus inadmissible. *Id.* The Court of Appeals stated:

> The trial judge ruled in this case that the report was admissible, but the statement regarding the cause of the fire was not because it was a conclusory opinion offered by a person not qualified to offer such an opinion. Thus [the county forester's] statement of opinion fails to meet the trustworthiness requirement of both MRE 803(8) and the second part of the *Beech* [*Aircraft*] test. This was a statement given by a person not qualified to make such a statement, and could hardly be considered trustworthy. For this reason, the statement fails to meet the trustworthiness requirements. Therefore the trial judge was not in error.

828 So. 2d at 809-10.

¶30. We pause here to discuss some of the information contained in the coroner's report, which was marked as Exhibit D-1, for identification purposes, only. Under "Marital Status" Cowart checked "Never Married." Unless Cowart personally knew Stewart, how did he know that Stewart had never married, unless he asked someone there at the scene, like Jones? Under

21

"Type of Work" and "Industry," Cowart wrote "Casino" and "Gaming,"respectively. Again, unless he personally knew Stewart, how did Cowart know that Stewart worked at a casino, unless he asked someone there at the scene, like Jones? Under "Found Dead By," Cowart wrote that Stewart was found dead by her boyfriend at 11:40 p.m. on 2-15-00. Now surely we can safely conclude that Cowart obtained this information by what could have been possibly no more than self-serving statements from Jones. Under the category "Is Decedent An Organ Donor," Cowart checked "No." Beside the "Yes" and "No" blanks is the phrase "(Please ask family when at all possible)." Did Cowart know that Stewart was not an organ donor because he looked at her driver's license, or did he do as the form report suggested by asking a family member or boyfriend, like Jones? While we recognize that Jones was not attempting to get all this information from the coroner's report before the jury, he was trying to get a redacted copy of the coroner's report before the jury to show that Cowart, in the report, had indicated the time of death to be 9:30 p.m.[13] However, we have discussed this other information in the coroner's report to show that Cowart would have had to rely on hearsay information to complete the report, and it is at least arguable, since Cowart was unavailable to testify due to his unfortunate death prior to trial, that Cowart also relied on this other hearsay information to aid him in estimating the time of death.

---

[13]Of course, we recognize that defense counsel stated he also wanted to get the state of rigor mortis before the jury, which as indicated in the coroner's report, there were at least early stages of rigor mortis in the neck, arms, and legs. However, without question, defense counsel focused his argument on the admissibility of a redacted copy of the coroner's report in order to show the coroner's estimated time of death to support Jones's alibi defense.

¶31.     We thus agree with both the Court of Appeals, and with today's trial judge, who applied *Redhead* to the case sub judice.    Additionally, exclusion of the evidence is supported by the comment under Miss. R. Evid. 803(8), which states in pertinent part:

> The experience in other jurisdictions which have adopted an identical rule has been that judges are exercising great caution in admitting these reports.    Often they are being excluded if based on hearsay or the opinions of those not involved in the preparation of the report.    The rule expressly gives judges the discretion to exclude such reports.

Recognizing that the focus of Jones's attention in getting a redacted copy of the coroner's report before the jury was the statement regarding time of death and references to the state of rigor mortis, this report unquestionably lacked trustworthiness.    Based on the facts of this case, the unfortunate demise of Tunica County Coroner Bart Cowart eliminated any hope for Jones in having this coroner's report admitted into evidence.    Likewise, we are not prepared to say today that this evidence would have been admissible even if Cowart had been available as a witness at the time of trial.    However, we can safely say that the coroner's report, in part or in toto, lacked trustworthiness.    We know not as to how Cowart arrived at Stewart's time of death.    Again, for all we know, Jones told him 9:30 p.m., or at the very least, Cowart had to rely on hearsay information to aid him in determining the time of death.    We do know that Tunica County Deputy Coroner Powell told the trial judge that Cowart did not have a medical degree and that a coroner is unable to arrive at an exact time of death.  In his proffer before the trial judge, Powell testified that a coroner can estimate the time of death "within an hour or so."    Also, whatever mileage Jones desired to get with the jury on the report's statements regarding rigor mortis was more than adequately obtained by other witnesses who were at the

23

scene and able to describe the condition of Stewart's body, as well as by Dr. Hayne's testimony from certain photographs of Stewart's body taken at the scene.

¶32.   For these reasons, we find that the trial court did not err in excluding the coroner's report, in whole or in part.   Reading our Rule 803(8) and its comment together, trial judges should cautiously exercise their discretion in ruling on the admissibility of similar reports which are based on hearsay and/or contain opinions of persons not involved in the actual preparation of the report.  Thus, this assignment of error is without merit.

### III.   WHETHER THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE GUILTY VERDICT.

### IV.   WHETHER THE GUILTY VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶33.   After the jury returned a verdict finding Jones guilty of murder, the trial judge promptly entered a judgment of conviction and imposition of a life sentence consistent with the statute. Jones timely filed his motion for a judgment notwithstanding the verdict, or in the alternative, for a new trial, which motion was denied by the trial court.

¶34.   We discuss Issues III and IV together, though we readily acknowledge that both the trial judge and this Court are required to consider altogether different criteria and factors in separately ruling on these motions.   "The motion for j.n.o.v. tests the legal sufficiency of the evidence supporting the verdict" while "[t]he motion for a new trial is an altogether different animal."   *Jesco, Inc. v. Whitehead*, 451 So.2d 706, 713-14 (Miss. 1984) (Robertson, J., specially concurring).   Our cases setting out the standard of review for the legal sufficiency

24

of the evidence are legion. In *Gleeton v. State*, 716 So.2d 1083, 1087 (Miss. 1998), we stated:

> [W]e must, with respect to each element of the offense, consider all of the evidence – not just the evidence which supports the case for the prosecution – in the light most favorable to the verdict. The credible evidence which is consistent with the guilt [of the accused] must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.
>
> *Wetz v. State*, 503 So.2d 803, 808 (Miss. 1987) (citations omitted).

716 So.2d at 1087 (quoting from *Franklin v. State*, 676 So.2d 287, 288 (Miss. 1996)).

¶35. As we have thus far noted on more than one occasion, the case sub judice was a circumstantial evidence case because Jones did not confess to the crime, nor were there eyewitnesses to the crime. *Mangum v. State*, 762 So.2d 337, 344 (Miss. 2000); *Stringfellow v. State*, 595 So.2d 1320, 1322 (Miss. 1992). Thus, the trial court quite appropriately gave a circumstantial evidence instruction to the jury. Instruction C-15 stated:

> The law presumes every person charged with the commission of a crime to be innocent. This presumption places upon the [S]tate the burden of proving the defendant guilty of every material element of the crime with which [he] is charged. Before you can return a verdict of guilty, the State must prove to your satisfaction beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that the defendant is guilty. The presumption of innocence attends the defendant throughout the trial and prevails at its close unless overcome by evidence which satisfies the jury of [his] guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. The defendant is not required to prove [his] innocence.

25

The Court instructs the jury that a reasonable doubt of guilt may arise from the evidence, from the lack of evidence, from an insufficiency of evidence, or from a conflict in the evidence; but however, it arises, if it does arise in your mind, then it both justifies and demands, under your oaths, that you return a verdict of not guilty.[14]

Likewise, in today's case, the jury was informed via a properly worded jury instruction that in order to find Jones guilty of the murder of Jennifer Stewart, the jury had to find from the evidence in the case "beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis other than that of guilt[15] that (1) On or about February 15, 2000, in Tunica County, Mississippi; (2) Jennifer Stewart, now deceased, was at the time a living person; (3) and that Jones did, with deliberate design; (4) kill Jennifer Stewart without authority of law. *See* Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2000). Again, the jury was further informed through this "elements" instruction, that if the State failed to prove any one or more of the elements beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis other than that of guilt, the jury had to find the defendant not guilty of the crime.

¶36.    Keeping all of this in mind, we turn again to the record.  Jones clocked out from work at Fitzgerald's Casino at 10:34 p.m. on February 15, 2000, presumably to drive to his residence at 308 Buck Island Trailer Park, where he and Jennifer Stewart lived.  The drive from Fitzgerald's to his residence was no more than a ten minute drive.  At 11:29 p.m., Jones made a 911 call requesting law enforcement to come to his residence.  Deputy Woods responded

---

[14]As to the second paragraph of this circumstantial evidence instruction, the defendant got more than that to which he was entitled.

[15]This is a different way of saying "every other reasonable hypothesis consistent with innocence."

immediately and upon arrival at 308 Buck Island Trailer Park, Woods found Jones standing outside his trailer covered in blood and crying. Officers Woods, McCulk and Payne went inside the trailer and found the body of a bloody Jennifer Stewart lying partially on the bed and on the floor, face up. There was blood "all over the house." There was human blood on Jones's tee shirt. The blood transfer pattern on Jones's tee shirt was consistent with the blood transfer pattern on the scarf Stewart was wearing at the time her body was discovered. A portion of the front of Jones's tee shirt contained blood stains consistent with the shirt being in close proximity to a medium velocity or cast off pattern associated with blunt force trauma or a stabbing incident. Stewart's death was a homicide caused from two lethal stab wounds consistent with a knife or box cutter. Certainly, when we view this evidence in the light most favorable to the State, we can unhesitatingly conclude that any reasonable, rational and fair-minded juror could have found from this evidence that the State of Mississippi had proved, beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence, each and every element of the crime of deliberate design murder. Put differently, we are certainly unable to state that from this evidence, with respect to one or more of the elements of the crime of deliberate design murder, any reasonable and fair-minded juror in the exercise of sound judgment could only find Jones not guilty of the brutal murder of Jennifer Stewart.

¶37. Because of the status of the record and the applicable law, we find that the trial judge in this case committed no error in denying Jones's motion for a judgment notwithstanding the verdict.

27

¶38.   "That as a matter of law the motion for judgment notwithstanding the verdict must be overruled and denied in no way affects and little informs the trial judge regarding his disposition of the motion for a new trial."   *Jesco*, 451 So.2d at 714 (Robertson, J., specially concurring).   As with a j.n.o.v. motion, our law is well-settled concerning our review of the trial court's denial of a motion for a new trial:

> A motion for a new trial, however, falls within a lower standard of review than does that for a judgment notwithstanding the verdict. *Id.* at 127.[16]  A motion for a new trial simply challenges the weight of the evidence.  *Id.* This Court has explained that it will reverse the trial court's denial of a motion for a new trial only if, by doing so, the court abused its discretion.  *Id.* (quoting *Gleeton v. State*, 716 So.2d at 1088).  "We will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice."  *Id.* (quoting *Groseclose v. State*, 440 So.2d 297, 300 (Miss. 1983)).This Court has also explained that factual disputes are properly resolved by a jury and do not mandate a new trial. *McNeal v. State*, 617 So.2d 999, 1009 (Miss. 1993). *Holloway v. State*, 809 So.2d 598, 605-06 (¶¶ 21-22) (Miss. 2000).

*Ginn v. State*, 860 So.2d 675, 685 (Miss. 2003).   *See also* *Bush v. State,* 895 So.2d 836, 844 (Miss. 2005), and  URCCC 10.05.

¶39.   As in any case in which the trial court has appropriately denied a motion for a directed verdict, and allowed the case to be submitted to the jury, today's case has conflicting testimony.  It is not part of our mandated appellate review to decide from conflicting evidence as to what verdict we would have rendered had we been the jury deciding this case.  Again, when the jury retired to deliberate, it had before it for consideration the testimony of Dwight Woods, a Tunica County Deputy Sheriff; Eugene Payne, a Tunica County Investigator; Christie

[16]*Sheffield v. State,* 749 So.2d 123 (Miss. 1999).

28

Smith, a serologist with the Mississippi Crime Lab; Dr. Steven Timothy Hayne, a forensic pathologist; Grant Dale Graham, Sr., a bloodstain pattern analyst with the Biloxi Crime Lab; and, Mary Lancaster, Jones's former co-worker when Jones worked at Harrah's Casino, who knew both Jones and Stewart.

¶40. On the other hand, the jury also had before it the testimony of Jones's bloodstain analysis expert, Paul Kish, who disagreed with Graham regarding the bloodstain pattern on Jones's tee shirt. If the jury accepted Graham's testimony, then the jury could find that the bloodstain pattern was a result of Jones stabbing Stewart with a sharp object such as a knife or box cutter. However, if the jury accepted Kish's testimony, then the jury could find that the bloodstain pattern was a result of Jones merely moving Stewart's bloody body which he had discovered upon his arriving home from work. Defense counsel quite appropriately argued to the jury that based on Dr. Hayne's testimony regarding the fact that rigor mortis normally occurred within two to four hours after death, and that based on Dr. Hayne admitting that from some of the photographs of Stewart's body taken at the scene at around 12:10 a.m., rigor mortis was already occurring, then death would have occurred no later than 10:10 p.m., and as early as 8:10 p.m., and that under either scenario, the undisputed evidence showed Jones to still be at work at Fitzgerald's Casino.[17] Defense counsel also argued to the jury that based on the appearance of the six stab wounds on Stewart's body, and the bloodstain patterns on Jones's shirt as testified to by Paul Kish, the jury could conclude from its "walking around sense" that

[17]Again, Jones clocked out from work at 10:34 p.m.

the killing of Stewart did not occur as the State theorized. In other words, there was no way that Jones could have been the killer.

¶41. In this circumstantial evidence case there was unquestionably conflicting evidence and conflicting theories presented to the jury, and thus, the jury, and only the jury, could determine the facts, as it found the facts to be from the evidence before it, and then apply those facts to the law as properly given to it by the trial court via the written instructions. We are thus unable to find that the jury's guilty verdict was so contrary to the overwhelming weight of the evidence so as to sanction an unconscionable injustice by allowing the verdict to stand.

¶42. From the record before us, the verdict of the jury is beyond our authority to disturb; therefore, in applying the appropriate law as enunciated concerning the motion for a new trial, we find the trial court committed no error in denying Jones's motion for a new trial. Thus we find that Jones's assignments of error as to the trial judge's denial of both his motion for a judgment notwithstanding the verdict, and his motion for a new trial, are without merit.

## CONCLUSION

¶43. Chris Jones was very ably represented by a competent and experienced defense attorney who vigorously represented Jones's interests before the jury. He succinctly laid out before the jury Jones's theory in the case, that being alibi – Jones was at work when the brutal murder of Jennifer Stewart occurred. Defense counsel seized upon the testimony of the experts and fervently argued to the jury that the blood spatter evidence was consistent with Jones not being the killer and that the time lines showed Jones to still be at work when the murder occurred. The trial court properly instructed the jury that since this was a circumstantial evidence case,

30

the jury could only find Jones guilty if the State proved each and every element of the crime of deliberate design murder beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence. We refuse to find legal fault with the jury's verdict based on the record before us and the applicable law.

¶44. Finding no reversible error, we affirm the Tunica County Circuit Court's final judgment of conviction for deliberate design murder, entered pursuant to the jury's verdict, and that court's subsequent imposition of a life sentence in the custody of the Mississippi Department of Corrections.

¶45. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**