# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-KA-01460-SCT

*YVONNE ELLIS a/k/a YVON ELLIS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/12/2005 |
| TRIAL JUDGE: | HON. C. E. MORGAN, III |
| COURT FROM WHICH APPEALED: | CARROLL COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | IMHOTEP ALKEBU-LAN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/27/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., CARLSON AND DICKINSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     On April 5, 2005, Yvonne Ellis, an adult male, was indicted for the statutory rape of E. M.[1] pursuant to Miss. Code Ann. § 97-3-65(1)(b) (Supp. 2005).  After a jury trial in the Circuit Court for the Second Judicial District of Carroll County, Ellis was convicted of this crime and sentenced to serve a term of twenty years in the custody of the Mississippi Department of Corrections.  After his motion for judgment notwithstanding the verdict, or, in the alternative,

---

[1]Since the female victim was only 13 years old at the time, her name will not be revealed.

a new trial was denied by the trial court, Ellis timely appealed the judgment of conviction to this Court. The sole issue Ellis raises for consideration is whether the trial court abused its discretion by admitting the State's DNA evidence, notwithstanding a perceived break in the chain of custody. Finding no error, we affirm.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. On October 12, 2003, Yvonne Ellis, then 37 years old, twice had consensual sexual intercourse with 13-year-old E. M. on the front steps of Jeff Chapel Church in Carroll County.[2]

¶3. After he was indicted for statutory rape, Ellis's trial commenced on May 11, 2005, in the Circuit Court for the Second Judicial District of Carroll County, Judge Clarence E. Morgan, III, presiding.

¶4. During the course of the two-day trial, the State called six witnesses. We briefly summarize here the testimony of these witnesses.

¶5. E. M. testified that she had been staying at her great grandmother's house with her cousin, T. K.[3] The girls received a telephone call after midnight, and they agreed to meet a group of four men outside the house. The girls met Yvonne Ellis, Timothy Grant, Undra Powell, and Cory Johnson, who were riding in a black Lexus. E. M. and T. K. got into the car

---

[2]E. M. turned fourteen the next day. However, pursuant to the provisions of Miss. Code Ann. §§ 97-3-65(1)(a), – 65(1)(b) (Supp. 2005), when a person the age of Ellis has consensual sexual intercourse with a child (whether that child be between the ages of fourteen and sixteen, or under the age of fourteen), that person is guilty of statutory rape, and neither the child's consent nor lack of chastity shall be a defense to a charge of statutory rape. *See* Miss. Code Ann. § 97-3-65(2) (Supp. 2005).

[3]Likewise, the name of E. M.'s cousin will not be revealed.

2

with the men, and they traveled to Jeff Chapel Church in Carroll County. Upon arrival at the church, the car was parked behind the church. E. M. testified that she and Ellis walked around to the front of the church and had sex on the steps of the church, while T. K. and the other three men stayed at the back of the church. According to E. M., she and Ellis had sex without the use of a condom. E. M. likewise testified that after they had sex, Ellis walked to the back of the church and then Grant appeared. E. M. and Grant then had sex at the front of the church. This time a condom was used.[4] When E. M. finished having sex with Grant, they walked to the back of the church and rejoined the group. The men then drove the two girls back to the house of E.M.'s great-grandmother, and left them there at the house. Shortly thereafter, T. K. informed E. M. that "somebody" had called and that E. M. should go outside and meet that person. When E. M. went outside, Ellis was waiting for her in the black Lexus. According to E. M., she and Ellis drove back to the church and had sex a second time.[5] E. M. also claimed that Ellis paid her $40 (two $20 bills), and then drove her back to her great grandmother's house. When E. M. arrived home, her family members took her to the University Hospital and Clinic (UHC) in Lexington.

¶6. Joanne Jones, the UHC nursing supervisor on duty that night, testified that she performed a rape kit examination on E. M. Evidence gathered that night at UHC included E. M.'s clothing, a sample of E. M.'s blood, dried semen secretions off of E. M.'s skin, vaginal

---

[4]Timothy Grant pleaded guilty to the statutory rape of E. M.

[5]Including the sexual act committed with Grant, this was the third time that 13-year- old E. M. had sex that night.

swabs, and the condom that E. M. used while having sex with Grant. Jones gave the collected evidence to Carroll County Deputy Sheriff Michael Spellman.

¶7. Paige Bowlus, a forensic biologist at the Mississippi Crime Laboratory (MCL), was accepted as an expert witness in forensic serology. Bowlus performed tests on the evidence in the rape kit prepared by Jones at UHC. Bowlus testified that although she did not personally receive the rape kit, an MCL technician received the evidence and submitted it to Bowlus, who then tested the evidence and placed case identification bar codes on the exhibits. Additionally, Bowlus testified that the MCL received four tubes of blood, two each drawn from Yvonne Ellis and Timothy Grant. Bowlus stated that she did not test the blood, but instead, the MCL personnel packaged these tubes of blood and sent them straight to Reliagene Technologies in New Orleans for testing.

¶8. Although the State had the MCL's Clydell Morgan available to testify that she was the person at the MCL who had packaged the tubes of blood and sent them to Reliagene, the State sought a joint stipulation, which was refused by defense counsel; however, the trial judge informed counsel that the chain of custody would be established if the State could show that Deputy Spellman delivered the tubes of blood to the MCL and that Reliagene received the tubes from the MCL. Therefore, the State did not call Morgan to testify. However, defense counsel offered a continuing objection to the four tubes of blood being entered as evidence, and the trial judge overruled the objection.

¶9. Deputy Spellman, who had arrested Ellis and Grant, indeed testified that he delivered E. M.'s rape kit and the four tubes of blood to the MCL. Pursuant to a court order, this blood

4

had been taken at Tyler Memorial Hospital in Winona. Deputy Spellman testified that he had personally seen nurse Elizabeth Hedgepeth draw the blood from the arms of Ellis and Grant. However, Deputy Spellman also testified that, while he had seen the nurse label the tubes, he could not remember whether the nurse had labeled the tubes before, during, or after she had taken the blood. Deputy Spellman also could not recall whether the nurse had first drawn the blood from Ellis or Grant. Additionally, he could not remember whether the four tubes had been packaged separately or together.

¶10. Huma Nasir, an employee of Reliagene Technologies in New Orleans, was tendered and accepted by the trial court as an expert witness in forensic DNA analysis. Nasir testified Reliagene received the evidence (the rape kit and four tubes of blood) sent via FedEx from the MCL. While Nasir did not personally receive the package, a tracking number was put on the package by an evidence technician at Reliagene when it was received. Nasir testified that the package was sealed and that everything appeared to be in the proper order when she received it. Nasir said that she personally conducted the tests comparing the rape kit evidence to the blood samples and found to a "reasonable degree of scientific certainty" that all of the specimens from E. M.'s rape kit, excluding the condom which was used while E. M. had sex with Grant, contained Ellis's DNA. Nasir also testified that Reliagene used its own chain of custody form, and the form had been filled out correctly. Reliagene packaged the samples and shipped them back to the MCL via UPS. Once received at the MCL, Deputy Spellman signed to receive the evidence back from the MCL.

¶11. Over defense objection that there was a break in the chain of custody, the trial court admitted the four tubes of blood to be into evidence.

¶12. The State recalled Paige Bowlus in an effort to clear up a perceived misunderstanding about the bar codes used for identification at the MCL. Bowlus testified that the bar code on the sealed bag which contained the four tubes of blood matched the bar code on the submission form. The four tubes of blood had not been labeled individually, but instead, they had been labeled as one package for identification at the MCL.

¶13. The final witness for the State was Undra Powell, one of the four men in the group when the sexual incidents occurred. Powell testified that he only saw E. M. go to the front of the church with Ellis, and then Grant, separately; however, Powell did not actually see anyone having sex.

¶14. After the State rested its case-in-chief, the defense called Deputy Spellman to testify about the $20 bills he had tested for fingerprints. Deputy Spellman, stated that Ellis's fingerprints were not found on the money Ellis supposedly paid E. M. for sex. T. K., E. M.'s cousin, testified that she had not actually seen E. M. have sex with either Ellis or Grant that night because she had stayed with the group at the back of the church. Finally, Ellis testified in his own behalf. Ellis claimed that he never had sex with E. M. He said that E. M. had a bad "body odor" when she stripped down to her underwear on the church steps, so he declined to have sex with her. Ellis also denied that the second meeting for sex ever happened. He claimed he gave E. M. and T. K. $20 each at the group meeting to stop them from arguing.

¶15.    After the defense rested, and the instructions had been read to the jury, closing arguments were conducted, and during the defendant's closing arguments, defense counsel suggested that the four tubes of blood could have been swapped because Deputy Spellman could not testify with certainty as to the labeling of the tubes.    However, the jury unanimously found Ellis guilty of statutory rape, and the trial judge sentenced Ellis to serve twenty years in the custody of the Mississippi Department of Corrections.

## DISCUSSION

¶16.    Yvonne Ellis has presented only one issue for us to consider.    We restate this issue for clarity.

### WHETHER THE TRIAL COURT ERRED IN ADMITTING CERTAIN EXHIBITS INTO EVIDENCE DUE TO A BREAK IN THE CHAIN OF CUSTODY.

¶17.    "Our well-established standard of review for reviewing the trial court's admissibility of evidence, including expert testimony, is abuse of discretion." *Jones v. State*, 918 So.2d 1220, 1223 (Miss. 2005) (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003); *McGowen v. State*, 859 So.2d 320, 328 (Miss. 2003); *Haggerty v. Foster*, 838 So.2d 948, 958 (Miss. 2002)).    "Our well-settled standard of review for the admission or suppression of evidence is abuse of discretion." *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003).    "Unless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the

7

accused in a criminal case, we will affirm the trial court's ruling." *Jones*, 918 So.2d at 1223 (citing *McGowen*, 859 So.2d at 328).

¶18. Ellis argues that the trial court erred by admitting the four tubes of blood taken from Ellis and Grant as DNA evidence. Ellis contends that the chain of custody was not properly established. He claims that the nurse who drew the blood may have mislabeled the tubes by inadvertently swapping the names of Ellis and Grant on the tubes. Ellis argues that for the evidence to have been admissible, the nurse, Elizabeth Hedgepeth, should have been required to testify at trial as to how she labeled the tubes and packaged them for shipment to the MCL. Ellis also argues that Clydell Morgan should have been required to testify as to how she received the tubes at the MCL and packaged them for shipment to Reliagene Technologies in New Orleans. Specifically, Ellis claims that without the testimony of Hedgepeth and Morgan on these critical issues, the chain of custody is incomplete or broken.

¶19. We turn to the record to consider the evidence on the issue of the chain of custody as to certain exhibits. Deputy Spellman witnessed the blood being drawn from Ellis and Grant by the nurse; however, he could not recall at trial as to when during the process the nurse actually labeled the tubes with the men's names. Deputy Spellman only recalled seeing the nurse put labels on the tubes. He also did not recall whether the nurse packaged the tubes together or separately to be sent to the MCL. Deputy Spellman then took the tubes to the MCL. Reliagene Technologies in New Orleans received the tubes from the MCL via FedEx. Finally, Reliagene sent the tubes via UPS back to the MCL, where they were retrieved by Deputy Spellman.

8

¶20. There is no lack of case law in Mississippi for questions of an alleged break in a chain of custody in criminal trials. Reversing a conviction on such a claim and disturbing the judgment below requires a finding of an abuse of discretion by the trial judge. "The admissibility of evidence rests within the discretion of the trial court." ***Spann v. State***, 771 So.2d 883, 893 (Miss. 2000) (relying on ***Sturdivant v. State***, 745 So.2d 240, 243 (Miss. 1999) (citing ***Baine v. State***, 606 So.2d 1076, 1078 (Miss. 1992); ***Wade v. State***, 583 So.2d 965, 967 (Miss. 1991))). The defendant in ***Spann*** contended that the missing link in the chain of custody was sufficient to warrant this Court's holding that the trial court abused its discretion in admitting the evidence in question. The defendant argued that the trial court erred in admitting the evidence when the evidence custodian of the police department did not testify as to his receipt and logging in of the evidence. However, this Court disagreed and instead agreed with the trial court that the State is not required to offer testimony from every person who handled the evidence. ***Id.*** at 893-94.

> The trial judge appropriately relied upon this Court's decision in ***Ormond v. State,*** 599 So.2d 951 (Miss. 1992), in ruling that absent Spann's contention of tampering or alteration of the projectile, the State had satisfied the rule of evidence governing the requirement of authentication or identification that the "condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Miss. R. Evid. 901(a). In ***Ormond***, this Court explained:

> ***

> > This case presents no evidence of alteration or substitution or tampering with the [evidence] at any time. Under the abuse-of-discretion standard, although the chain may not have been thoroughly demonstrated, in the absence of any contention of

> alteration or tampering, the trial court did not abuse its discretion
> in admitting the [evidence].
>
> **Ormond**, 599 So.2d at 959. The test of whether there has been a break in the chain of custody of evidence is whether there is an indication or reasonable inference of probable tampering with the evidence or substitution of the evidence. **Nalls v. State**, 651 So.2d 1074, 1077 (Miss. 1995) (citing **Gibson v. State**, 503 So.2d 230, 234 (Miss. 1987); **Nix v. State**, 276 So.2d 652, 653 (Miss. 1973)).

**Spann v. State**, 771 So.2d at 894.

¶21. The proponent of the evidence must show no reasonable inference of material tampering with, or substitution of, the evidence; however, Mississippi law has never required a proponent of evidence to produce every handler of the evidence. **Ormond**, 599 So.2d at 959 (relying on **Butler v. State**, 592 So.2d 983, 985 (Miss. 1991)).

¶22. Ellis argues that there are two breaks in the chain of custody. He asserts that because Deputy Spellman could not state with certainty when he saw nurse Hedgepeth label the tubes or how she packaged them, there is a reasonable inference of substitution because the nurse could have mislabeled the tubes by inadvertently swapping the names of Ellis and Grant on the tubes. However, this Court has stated:

> In **Gibson v. State**, 503 So.2d 230, 234 (Miss.1987), this Court opined:
>
>> [T]he test for the continuous possession [*i.e.,* "chain of custody"] of evidence is whether or not there is any indication or reasonable inference of probable tampering with the evidence or substitution of the evidence.
>
> *See* **Barnette v. State**, 478 So.2d 800, 804 (Miss. 1985); **Morris v. State**, 436 So.2d 1381, 1388 (Miss. 1983); *see also* **Lambert v. State**, 462 So.2d 308, 312 (Miss. 1984); **Grady v. State**, 274 So.2d 141, 143 (Miss. 1973). "In such

matters, the presumption of regularity supports the official acts of public officers," and the burden to produce evidence of a broken chain of custody (*i.e.*, tampering) is on the defendant. ***Nix v. State***, 276 So.2d 652, 653 (Miss. 1978), *quoted in **Barnette**,* 478 So.2d at 804.

***Hemphill v. State***, 566 So.2d 207, 208 (Miss. 1990).

¶23. While it could be argued that the nurse's actions do not enjoy the presumption of regularity because she is not a public official, Ellis still has the burden of proving that the tubes were substituted. He simply offers no proof that substitution occurred. A mere suggestion that substitution could possibly have occurred does not meet the burden of showing probable substitution.

¶24. Additionally, the case law is clear that the State did not have to call every witness who handled the blood to establish the chain of custody. The jury could reasonably understand who had possession of the blood at all times. No witness who did testify gave any reason for the jury to believe that anything irregular occurred with this evidence. We find that the trial court did not abuse its discretion in admitting the blood evidence. Thus, there is no merit to this assignment of error.

## CONCLUSION

¶25. For the reasons stated, the judgment of the Circuit Court for the Second Judicial District of Carroll County is affirmed.

¶26. **CONVICTION OF STATUTORY RAPE AND SENTENCE OF TWENTY (20) YEARS, WITH CONDITIONS, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

   **SMITH, C.J., WALLER AND COBB, P.JJ., DIAZ, EASLEY, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR.**

11