# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-01130-SCT

*SHERWOOD DWAYNE BROWN a.k.a.*
*SHERWOOD BROWN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/31/2013 |
| TRIAL JUDGE: | HON. ROBERT P. CHAMBERLIN |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES DOUGLAS MINOR, JR. |
| | GARLAND T. STEPHENS |
| | JOHN R. LANE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JASON L. DAVIS |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 03/26/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     A DeSoto County jury convicted Sherwood Brown of one count of capital murder and two counts of murder and sentenced him to death.  The Court granted Brown's successive petition for post-conviction relief and allowed Brown to proceed in the trial court on his claim that he was mentally retarded and exempt from execution.  After a hearing, the trial court held that Brown had failed to prove by a preponderance of evidence that he was mentally retarded.  Brown appealed.

## Factual Background and Procedural History

¶2.   The jury convicted Sherwood Brown of one count of capital murder, committed during the commission of felonious child abuse, for the murder of thirteen-year-old Evangela Boyd and two counts of murder for killing Verline Boyd and Betty Boyd, Evangela's mother and grandmother. For the capital murder conviction, the jury sentenced Brown to death; the trial court imparted consecutive life sentences for the two counts of murder. A unanimous Supreme Court affirmed Brown's convictions and sentences on direct appeal. *Brown v. State*, 690 So. 2d 276 (Miss. 1996).

¶3.   Several years later, the Court unanimously denied Brown's application for leave to seek post-conviction relief, in which he raised nearly seventy issues. *Brown v. State*, 798 So. 2d 481 (Miss. 2001). In 2004, Brown filed a successive application for leave to seek post-conviction relief, seeking permission to proceed in the trial court on his claim that he was mentally retarded and exempt from execution under *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Chase v. State*, 873 So. 2d 1013 (Miss. 2004). The Court granted Brown's request for leave. *Brown v. State*, 875 So. 2d 202 (Miss. 2004). The trial court held an *Atkins* hearing and heard testimony from Brown's wife, a former teacher, the special-education director for DeSoto County Schools, and three doctors who had evaluated Brown.

### A. Family and Educators

¶4.   Brown presented testimony from his wife, Angela Brown, and his sixth-grade teacher, June Gilbreath. Angela testified that she met Brown in late 1989 or early 1990, and they married in July of 1990. Both were in their early twenties. Angela and Brown lived with

Brown's parents for four years until his arrest in 1994. According to Angela, Brown never lived away from his parents' home, but they were working toward getting their own place when he was arrested. Angela testified that Brown did not manage money well, did not have a bank account, and did not pay bills, but that he gave Angela money for groceries sometimes and gave his mother money for bills occasionally. Angela said Brown spent his free time with friends, often using drugs. Angela described Brown as immature, reckless, easily frustrated, and irresponsible, saying, "[i]t was like someone had always taken care of him so he didn't have to do anything." However, she testified that Brown could cook basic things, that he ran errands to a nearby store, and that he picked up after himself.

¶5.     Angela said Brown had worked delivering beer for both the Miller and Budweiser beer companies, but he did not drive the delivery truck. She testified that Brown did not have any problems getting up and dressing himself for work, although his mother drove him to work. Angela thought Brown was fired from Budweiser, but she could not remember the reason. She testified that Brown loved football, and his family had told her that, when Brown was in high school, they thought he had a promising football career. She also told a story she had heard from Brown's mother that, as a child, Brown dressed himself and drove to church while his mother slept. Angela testified that Brown often argued with both of his parents, and she described his mother as "volatile" and "explosive" due to her alcohol problem. Despite their troubles, Angela testified that Brown loved his parents. Brown had two sons by another woman. Angela said that Brown interacted well with the children, but he was not left alone with them.

¶6. June Gilbreath taught Brown in sixth grade; she served as his advisory teacher and managed his academic transcript that year. Gilbreath explained that her handwritten notation of "LD" on Brown's transcript meant "learning disabled" or "learning disability." Gilbreath said Brown struggled academically in elementary school. He repeated first grade and, despite failing grades, Brown received "social promotions" because of his size in the fourth and fifth grades. In sixth grade, his grades improved because they were "modified," which meant Brown was given easier material and tests than the other students. Brown spent a year and a half in seventh grade before being promoted to the second semester of eighth grade. Gilbreath said Brown's grades were modified again in the eighth grade, and he received higher grades that year. Looking at Brown's standardized test scores, Gilbreath testified that Brown was at a second-grade reading level and a third-grade math level when he was in fifth grade. In sixth grade, he scored a third-grade reading level and a fourth-grade math level. Finally, Gilbreath testified that Brown's transcript reflected that he put forth his best effort during school.

¶7. Susan Kizer testified for the State. Kizer is the special-education director for DeSoto County Schools and previously was a special-education teacher. Kizer reviewed Brown's transcript and testified about the handwritten "LD" notation. She explained that "SLD" was the correct way to denote a learning disability; "LD" had no meaning to her and was not a customary way to acknowledge that a student was learning disabled. Kizer testified that a transcript would not necessarily indicate whether a student was in special education. She explained that a teacher should not make a determination of whether a student has a learning

4

disability, as that determination is made only after a comprehensive evaluation. Kizer did not have personal knowledge as to whether Brown was in special education, and she was not able to locate any DeSoto County School records showing that he was, because school records are destroyed after seven years.

### B. Expert Testimony

¶8.    Brown presented Dr. Marc Zimmermann, a licensed psychologist, as a expert witness. Dr. Zimmerman was accepted as an expert in clinical psychology, forensic psychology, intellectual disability, and IQ testing. He said that it is difficult to determine whether someone is mentally retarded absent a full assessment because most mentally retarded individuals are mildly so. He explained that the Diagnostic and Statistical Manual Fourth Edition (DSM-IV) – the American Psychiatric Association's compendium of mental diseases – provides that most mentally retarded individuals achieve sufficient social and vocational skills to maintain minimal self-support but need assistance to deal with "unusual social or economic stress." According to Dr. Zimmermann, some mentally retarded individuals marry, have children, cook, clean, drive, maintain their appearance, and play sports.

¶9.    Dr. Zimmermann explained the three criteria necessary for a diagnosis of mental retardation: significantly low intellectual ability, two adaptive functioning deficits, and manifestation prior to age eighteen. Dr. Zimmermann evaluated Brown in preparation for the *Atkins* hearing; Brown was thirty-nine years old at the time of the evaluation. Dr. Zimmerman used the Wechsler Adult Intelligence Scale, Third Edition, to measure Brown's IQ, and found that he had a seventy-five full-scale IQ, falling within the mildly mentally

retarded range. The State's expert also found Brown's IQ to be seventy-five. Dr. Zimmermann opined that the consistency indicated that the score was accurate and that Brown was not malingering. Dr. Zimmermann also administered the Rey-15 Item Test, which showed a low probability that Brown was malingering.

¶10. Next, Dr. Zimmermann analyzed Brown's adaptive functioning deficits. He interviewed several people who knew Brown, reviewed his school and social security records, and administered the Vineland Adaptive Behavior Scales to Brown's wife. The Vineland measures a person's ability to function in various aspects of life, covering the adaptive functioning areas listed in the DSM-IV.[1] He administered the test to Brown's wife, Angela, because of a phenomenon called the Cloak of Competency, which posits that individuals tend to overestimate their own skills. Because the DSM-IV requires onset before age eighteen, ideally the tested person should have known the subject prior to that age. Although Angela did not know Brown prior to age eighteen, Dr. Zimmermann administered the Vineland to her because she was the person who knew Brown closest to age eighteen of those available to test. Dr. Zimmermann explained that he asked Angela to answer the questions by thinking back to when they first met, closest to age eighteen.

¶11. Based on the information provided by Angela, Dr. Zimmerman testified that the Vineland test revealed that Brown's age equivalence for receptive speech was three years, seven months; expressive speech was seven-and-a-half years; written communication was

---

[1] The adaptive functioning areas are: communication, self-care, home living, social and interpersonal skills, use of community resources, self-direction, health and safety, functional academics, work, and leisure. *Chase*, 873 So. 2d at 1027-28 (¶ 69).

6

ten years; personal daily living skills was ten-and-a-half years; domestic skills was thirteen years; community skills was nine years and ten months; interpersonal relationships was eleven-and-a-half years; and coping skills was three years, five months. Dr. Zimmermann conceded that Brown had the ability to take care of his own basic hygiene and to cook basic dishes. He acknowledged Brown's substance abuse and opined that it evidenced an adaptive functioning deficit in health and safety. Questioned about Brown's adaptive functioning deficit in academics, he opined that, while the "LD" notation may not be dispositive of a deficit, schools commonly label children as learning disabled rather than assess for mental retardation. Dr. Zimmermann concluded that Brown has significant adaptive functioning deficits in communication, self-care, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, and safety. Dr. Zimmerman opined that the deficits in adaptive functioning existed prior to Brown's commission of the crime.

¶12.   As for manifestation prior to age eighteen, Dr. Zimmermann identified Brown's academic transcript and conflicts with family members as a child. He also pointed to several factors that could have predisposed Brown to mental retardation as a child: his mother's alcohol use during pregnancy, head trauma from a childhood car accident, inhaling gasoline as a child, and his family's history of mental illness. Ultimately, Dr. Zimmermann opined that Brown was mentally retarded, possessing a seventy-five IQ and several adaptive functioning deficits, which he concluded manifested before age eighteen.

¶13.   The State presented Dr. Robert Storer, the State's psychologist, who also evaluated Brown in preparation for the *Atkins* hearing. Dr. Storer was accepted as an expert in clinical

7

and forensic psychology. After evaluating Brown, Dr. Storer concluded that Brown is not mentally retarded. To measure Brown's IQ, Dr. Storer administered the Wechsler Adult Intelligence Scale, Fourth Edition, which revealed that Brown had an IQ of seventy-five. Like Dr. Zimmermann, Dr. Storer testified that similar results in their respective testing bolstered their reliability. Dr. Storer administered several measures to determine whether Brown was malingering and concluded that he was not. Dr. Storer administered two tests to determine whether Brown possessed the ability to take a test designed to measure adaptive functioning deficits. The Wide Range Achievement Test indicated that Brown's word-reading ability was just below a ninth-grade level and his sentence-comprehension ability was at a seventh-grade level. The Mini Mental Status Exam, which measures memory and dementia, indicated that Brown had minimal or no impairment in those areas.

¶14.   Dr. Storer also evaluated Brown to determine whether he possessed any adaptive functioning deficits. Dr. Storer noted Brown's ability to care for his children and take them to the doctor. He explained that, while not dispositive, that suggested Brown possessed good communication skills, awareness of health issues, and a sense of responsibility. Dr. Storer opined that Brown's ability to cook evidenced his ability to care for himself and weighed against an adaptive functioning deficit in that area. Dr. Storer reviewed Brown's academic transcript and noted that the fact that Brown had failed the first grade was of particular concern because failing early grades indicates more severe problems, but that it does not in and of itself mean a person is mentally retarded. Overall, he opined that the transcript revealed Brown was not a stellar student, but that he passed numerous grades and advanced

8

in standardized test scores from year to year. Dr. Storer said he could not formulate an opinion as to what the "LD" notation meant. He acknowledged that Brown was probably in special education classes, but said that would not mean Brown had received the comprehensive testing necessary to determine if he was mentally retarded. Dr. Storer reported that Brown's football coaches stated that he was never deemed academically ineligible to play football.

¶15. Dr. Storer opined that Brown's participation in the Job Corps indicated good use of community resources. Considering Brown's work history, Dr. Storer testified that Brown's numerous job changes could indicate an adaptive functioning deficit, but that it was more likely explained by his substance abuse. Dr. Storer acknowledged, however, that evidence pointed to Brown being fired, on one occasion, for fighting with a manager. Dr. Storer interviewed Brown's father and Brown's highschool girlfriend and mother of two of his children. Both indicated that Brown had a commercial driver's license. Brown himself also claimed that he had a commercial driver's license.

¶16. When asked if Brown's fights with family members was evidence of mental retardation, Dr. Storer said it could be if Brown's reaction resulted from a lack of understanding or inappropriate emotional response, but that he had seen no evidence of that. Instead, he found that fighting was not unusual in Brown's family environment. Dr. Storer administered the ABAS-II to measure adaptive functioning deficits and testified that the test did not reveal any adaptive functioning deficits. He concluded that Brown had difficulties

in some areas, but none was significant enough to rise to the level of an adaptive functioning deficit. Thus, Dr. Storer opined that Brown was not mentally retarded.

¶17. Dr. Reb McMichael, the State's psychiatrist, evaluated Brown along with Dr. Storer. He was called as a rebuttal witness by Brown's counsel, but was not qualified as an expert. Dr. McMichael testified that approximately eighty-five percent of mentally retarded individuals are mildly mentally retarded. He testified that individuals with mild mental retardation are capable of driving cars, cooking, cleaning, maintaining personal hygiene, maintaining employment, getting married, and having children. Dr. McMichael was present for Dr. Storer's interview with Brown and had input into Dr. Storer's report. Because Dr. McMichael was not qualified as an expert, he was not permitted to testify as to whether he believed Brown to be mentally retarded.

### C. Trial Judge's Order

¶18. Following the hearing, the circuit judge entered an order on the *Atkins* issues. The order cited the *Chase* standard that a finding of mental retardation requires subaverage intellectual functioning, significant limitations in adaptative functioning in at least two areas, and onset prior to age eighteen. The trial judge found that Brown had the necessary subaverage intellectual functioning to be deemed mentally retarded pursuant to *Atkins* and *Chase*. Both experts determined that Brown had a full-scale IQ of seventy-five, and the parties agreed that Brown's score placed him in the range necessary to satisfy the first *Chase* prong. The trial judge then considered the evidence and testimony regarding Brown's academic skills, work history, self-care and home living, social/interpersonal skills, and

10

health and safety. He concluded that Brown did not have any functional deficits in these areas. Thus, the trial court found that, while Brown had a low IQ, he failed to show that he had adaptive functioning deficits or mental retardation manifested before age eighteen. Therefore, the trial court held that Brown had failed to prove by a preponderance of evidence that he was mentally retarded. Brown appealed.

**Discussion**

¶19.    Brown asserts that the trial court failed to apply the *Chase* standards correctly and that the opinion "is based on a misapplication of the law and factual conclusions unsupported by the substantial evidence." Brown raises several assignments of error on appeal, each of which can be included under the following three issues: (1) whether the trial court applied an incorrect legal standard; (2) whether the trial court's findings of fact were clearly erroneous; and (3) whether the trial court erred in admitting certain expert testimony.

¶20.    Brown had the burden of proof at the evidentiary hearing to show by a preponderance of the evidence that he is mentally retarded and, thus, entitled to relief. *Goodin v. State*, 102 So. 3d 1102, 1111, 1112 (¶¶ 30, 32) (Miss. 2012). The standard of review following an evidentiary hearing in a post-conviction relief case is well settled:

> "When reviewing a lower court's decision to deny a petition for post[-]conviction relief this Court will not disturb the trial court's factual findings unless they are found to be clearly erroneous." *Brown v. State*, 731 So. 2d 595, 598 (Miss. 1999) . . . . In making that determination, "[t]his Court must examine the entire record and accept 'that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's finding of fact . . . .'" *Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987) (quoting *Cotton v. McConnell*, 435 So. 2d 683, 685 (Miss.

11

1983)). That includes deference to the circuit judge as the "sole authority for determining credibility of the witnesses." ***Mullins***, 515 So. 2d at 1189[.]

***Goodin***, 102 So. 3d at 1111 (¶ 30) (quoting ***Doss v. State***, 19 So. 3d 690, 694 (¶ 5) (Miss. 2009)). Questions of law are reviewed de novo. ***Id.***

> **I. Whether the trial court applied an incorrect legal standard to the application of the *Chase* standard.**

¶21. "[T]he clinical definition of mental retardation requires (1) subaverage intellectual functioning (2) accompanied by significant limitations in at least two adaptive skills (3) that manifest before age eighteen." ***Goodin***, 102 So. 3d at 1104 (¶ 2) (citing ***Atkins***, 536 U.S. at 318; ***Chase***, 873 So. 2d at 1027-28). Brown argues that the circuit judge applied an incorrect legal standard for three reasons: (1) he claims that the trial judge turned the "manifest before age eighteen" requirement into an evidentiary requirement that only evidence from people Brown knew before age eighteen could be used to prove adaptive functioning deficits; (2) Brown argues that the trial judge imposed a heightened burden when considering whether Brown proved the existence of an adaptive functioning deficit in functional academics; (3) Brown asserts that in the adaptive functioning area of work, the trial judge incorrectly focused his analysis on what Brown *could* do, rather than what he *could not* do.

## A. Onset Prior to Age Eighteen

¶22. The parties dispute whether the ***Chase*** standard requires the petitioner to present evidence that adaptive functioning deficits manifested prior to age eighteen. Brown argues that "there simply is no requirement under Mississippi law that adaptive functioning deficits be present before age eighteen," and he asserts that the Court has held that adaptive

functioning deficits should be measured "prior to incarceration" not "before age eighteen." Brown is taking the Court out of context. The rationale behind the Court's statement that adaptive functioning deficits should be measured "prior to incarceration" is that deficits in adaptive functioning should not to be measured after the defendant has been incarcerated, because inmates do not have the option to perform the activities and behaviors that are assessed. Thus, assessment of adaptive functioning after a defendant has been incarcerated likely would not be an accurate assessment of his or her abilities at the time of the crime.[2] The Court clearly has held that the onset of significantly subaverage intellectual functioning and adaptive functioning deficits both must manifest prior to age eighteen.

> This Court in ***Chase*** adopted the clinical definition of mental retardation set forth by the Supreme Court in ***Atkins***. "Mental retardation refers to substantial limitations in present functioning." ***Chase***, 873 So.2d at 1027 (quoting ***Atkins***, 536 U.S. at 308 n.3, 122 S. Ct. 2242). According to the AAMR, mental retardation is characterized by: (1) "significantly subaverage intellectual functioning," (2) "existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work," (3) *which* "manifests before age 18." ***Id.*** . . .

***Goodin***, 102 So. 3d at 1112 (¶ 33) (emphasis added). Brown's argument that adaptive functioning deficits do not have to be present prior to age eighteen is without merit.

¶23.    Brown also argues that the judge erroneously disregarded the results of the Vineland Adaptive Behavior test because Angela did not know Brown before he turned eighteen. The

---

[2] *See **Doss v. State***, 19 So. 3d 690, 714 (¶ 49) (Miss. 2009) (quoting Linda Knauss and Joshua Kutinsky, *Into the Briar Patch: Ethical Dilemmas Facing Psychologists Following **Atkins v. Virgina***, 11 Widener L. Rev. 121, 131 (2004) ("Few (if any) measures of adaptive functioning have been designed or normed for use with a correctional population. Thus, adaptive functioning prior to incarceration should be the target for assessment.")).

Vineland measures a person's ability to function in various aspects of life, and that test was given to Brown's wife, Angela. She was asked to recall back to as close to Brown being eighteen as possible. In his order, the trial judge acknowledged that the test had been administered to Angela. The judge also recognized that the doctor who had administered the test, Dr. Zimmerman, admitted that it would have been preferable for the test to be given to someone who knew Brown before age eighteen. In his discussion of the adaptive functioning deficits, the judge mentioned Angela's testimony about Brown, including references Angela made to things she had heard about Brown as a child and teenager.

¶24.    Under *Atkins* and *Chase*, the third requirement for proving mental retardation is manifestation before age eighteen. *See Atkins*, 536 U.S. at 308 n.3, 318; *Chase*, 873 So. 2d at 1022-23 (¶¶ 43-44). In *Goodin*, we held that an expert may utilize any accepted test of adaptive functioning deficits, but that a retrospective analysis is necessary to show onset prior to age eighteen. *Goodin*, 102 So. 3d at 1114 (¶ 39). We stated:

> This Court has noted the importance of interviewing family and friends knowledgeable about the defendant's past. Interviews with educators or others in the community familiar with the defendant's behavior before age eighteen also would provide valuable information. Adaptive-functioning tests may be administered to these individuals as well. A retrospective evaluation also could include a thorough review of school records, social history, and work history, among other things.

*Id.* The judge had before him testimony from expert psychologists who had evaluated Brown, interviewed Brown's family members, friends, and former educators, and reviewed Brown's school records, work history, family history, and social history. The judge also

heard testimony from Brown's wife and a former teacher. He had ample evidence of Brown's behavior and abilities before age eighteen.

¶25. The trial judge outlined the evidence and testimony that had been presented and concluded that it was not persuasive that mental retardation had manifested before Brown was eighteen:

> In an attempt to show onset of mental retardation prior to the onset of age eighteen, Dr. Zimmerman testified that the consumption of alcohol by Brown's mother *may* have caused his mental retardation along with some head trauma Brown suffered. He also asserted that Brown's family history of mental illness supports a finding that he is mentally retarded. Brown's sixth grade teacher testified, and the State disputed, that Brown was in special education classes. No results of any psychological testing done before Brown was 18 was presented. On his school transcript, the California Achievement Test results showed he was reading at a second grade level in the fifth grade and was almost a fourth grade level in math[,] and the next year he improved somewhat. The [c]ourt finds that the petitioner offered no persuasive testimony [that] supports the onset of mental retardation prior to age eighteen.

The judge considered and weighed all of the evidence presented and made a reasoned finding based on the evidence and testimony before him. Certainly the record does not indicate that the trial judge "ignored" the Vineland test results as Brown alleges. Although it cannot be concluded from the record that he did so, if the trial judge determined that less weight should be given to the Vineland test result because Angela did not know Brown before age eighteen or for any other reason, then he had the discretion to do so. We give deference to the trial judge as the ultimate finder of fact, and we will not reweigh the evidence on appeal.

¶26. Brown's claim that the trial judge incorrectly heightened the standard by requiring Brown to utilize only evidence from before he was eighteen is not supported by the record.

**B. Functional Academics**

15

¶27. Next, Brown argues that the trial judge applied a heightened burden of proof in his analysis of functional academics. In his analysis of adaptive functioning in the area of functional academics, the judge considered conflicting evidence of whether Brown had been identified as a learning-disabled student. The judge also acknowledged that there was no evidence of a formal finding that Brown had a learning disability, "much less that the disability met the legal definition of mental retardation for *Atkins* purposes." The judge had conflicting evidence before him from teachers, coaches, a principal, and Brown himself. However, it was not disputed that Brown failed to present evidence of a formal evaluation or finding of a learning disability. Even though his school records had been destroyed, Brown did not put on evidence of anyone who remembered that he had been formally evaluated.

¶28. The judge took into consideration that there was no evidence of a formal evaluation and considered that among all of the evidence presented, including: testimony of educators; Brown's school transcript showing his grades and promotion through school; Brown's reading level and sentence-comprehension skills, which were between a seventh-grade and ninth-grade level; and other test results presented by the experts. The judge concluded that Brown "did suffer some deficiencies in academic achievement," but that the deficiencies did "not appear to be the type confined to those suffering from mental retardation." He held that Brown did not satisfy the burden of proof for establishing that he had a significant deficit in adaptive functioning in the area of functional academic skills. Brown's argument that the judge applied a heighten burden of proof is without merit.

16

## C. Work

¶29. Finally, Brown argues that, in his analysis of the adaptive functioning area of work, the trial judge incorrectly focused on what Brown could do, rather than what he could not do. Brown cites a law review article for the proposition that the analysis of adaptive functioning deficits must focus on deficits, not abilities. But that view is inconsistent with our precedent, which has considered expert testimony regarding what a person is able to do in conjunction with what he or she cannot do. *See* **Goodin**, 102 So. 3d at 1106, 1110-11; **Thorson v. State**, 76 So. 3d 667, 673 (Miss. 2011); **Doss**, 19 So. 3d at 712. Assessing either deficits or abilities in a vacuum would not give a full picture of an individual's functioning in any area. Further, other than the apparent inability to hold a job, evidence was not presented about what Brown could not do in the area of work. The trial judge did not err by considering Brown's abilities along with his deficits.

¶30. Each of Brown's claims regarding the trial court's application of the correct legal standard is without merit. The trial judge applied the correct legal standard in determining whether Brown satisfied the **Chase** requirements.

## II. Whether the trial court's finding that Brown did not have significant deficits in adaptive functioning was clearly erroneous.

¶31. To satisfy the clinical definition of mental retardation, the petitioner must prove beyond a preponderance of the evidence that he had significant limitations in at least two adaptive functioning skills. **Goodin**, 102 So. 3d at 1104, 1111 (¶¶ 2, 30) (citations omitted). Following an evidentiary hearing in a PCR case, the trial court's findings of fact must be clearly erroneous to warrant reversal. **Goodin**, 102 So. 3d at 1111 (¶ 30) (quoting **Doss**, 19

17

So. 3d at 694). The adaptive skill areas to be considered are: communication, self-care, home living, social and interpersonal skills, use of community resources, self-direction, health and safety, functional academics, work, and leisure. *Goodin*, 102 So. 3d at 1112 (¶ 33); *Chase*, 873 So. 2d at 1027-28 (¶ 69).

¶32. Brown claims that the trial court's finding that he did not have significant adaptive functioning deficits in the areas of functional academics, work, self-care and home living, social/interpersonal skills, and health and safety was clearly erroneous. Brown takes issue with the trial judge's conclusion that many of Brown's job difficulties and trouble in the areas of social/interpersonal skills and health and safety could have been attributed to a substance abuse problem. While the judge did note that many of the cited issues were consistent with someone who had a substance abuse problem, that was not the only evidence he considered. In a twelve-page order, the judge outlined the testimony and evidence presented regarding each area of adaptive functioning.

¶33. The trial judge first considered whether Brown had an adaptive functioning deficit in the area of functional academic skills. The judge outlined the testimony from Gilbreath, Kizer, Dr. Zimmerman, and Dr. Storer and concluded that "Brown did suffer from some deficiencies in academic achievement," but "the deficiencies do not appear to be the type confined to those suffering from mental retardation." He stated that other than the "LD" notation, "no proof has been presented that there was ever a finding that Mr. Brown suffered from a learning 'disability' much less that the disability met the legal definition of mental retardation for *Atkins* purposes." Finally, the judge found that Brown's academic difficulties

18

were "simply not unique and could equally be explained by any number of reasons other than an 'adaptive functioning deficit,'" and that Brown had failed to satisfy his burden of proof to show a significant adaptive functioning deficit in functional academic skills.

¶34. Next, the trial judge analyzed whether Brown had an adaptive functioning deficit in the work area. The order discussed Dr. Zimmermann's testimony that Brown had lost several jobs for poor performance or fighting with his supervisors and his expert opinion that Brown had a corresponding adaptive functioning deficit. The trial judge noted that Brown worked as a delivery person for several companies; worked for an energy company; worked as a packer on an assembly line; and had been in the Job Corps. The order discussed Dr. Storer's expert findings that, though frequent jobs changes could evidence an adaptive functioning deficit, he did not attribute Brown's struggles to an adaptive functioning deficit and opined that the job difficulties may have been due to Brown's substance abuse. The trial judge concluded that Brown did not have a significant adaptive functioning deficit in work. The order reasoned that "the testimony presented could clearly be explained just as easily as a substance abuse problem as a mental retardation indicator." The judge found that Brown's ability to perform his jobs made substance abuse a more likely cause of his termination, and that his repeated job turnover did not establish an adaptive functioning deficit.

¶35. The judge then considered whether Brown had an adaptive functioning deficit in the areas of self-care and home living. The trial judge considered that Brown had never lived on his own, did not understand money, and could not manage his own finances, but could cook, clean, and take his children to the doctor. The judge concluded that, while Brown

continued to live with his parents as an adult and allowed his mother and wife to take care of him, that "does not meet the definition of an adaptive functioning deficit" and "fits the expected pattern of a drug abuser."

¶36. Analyzing whether Brown had an adaptive functioning deficit in social and interpersonal skills, the judge noted that Brown had several violent confrontations with family members and that Brown claimed he was fired from various jobs for fighting with management. The fights with his family members often occurred at home, which seemed to be a volatile setting where fighting was common. The judge concluded that the outbursts of anger described would be common for someone with a substance abuse problem and that Brown had failed to prove an adaptive functioning deficit.

¶37. Finally, the order considered whether Brown had an adaptive functioning deficit in the areas of health and safety. The order noted Dr. Zimmermann's expert opinion that Brown's substance abuse both later in life and as a child was indicative of an adaptive functioning deficit and a predisposing factor for mental retardation. The judge also noted that Brown's wife had reported that he was a reckless driver, totaling several cars, and that he did not go to the doctor on a regular basis. He concluded that "[t]hese are mere isolated incidents some of which clearly reflect substance abuse" and "a broad statement that Brown did not regularly go to the doctor or to a dentist is insufficient."

¶38. Although Dr. Zimmerman opined that Brown had significant deficits in adaptive functioning, Dr. Storer concluded that Brown's scores on formal measures of adaptive functioning were below average, "but not two standard deviations or more below average as

20

would be required for a diagnosis of mental retardation." A "conflict in the evidence presented is properly resolved by the trier of fact[,]" in the case *sub judice*, the trial judge. *Martin v. State*, 871 So. 2d 693, 698 (¶ 18) (Miss. 2004). We will not reweigh evidence or make findings of fact. "Fact-finding is left to the trial courts, and we 'review findings of fact with great deference.'" *Butler v. State*, 102 So. 3d 260, 270 (¶ 29) (Miss. 2012) (citing *Scott v. State*, 981 So. 2d 964, 969-70 (¶ 21) (Miss. 2008)).

¶39.    In the instant case, the trial court considered expert testimony, psychological testing and evaluation, school records, social history, work history, testimony from teachers, and testimony from Brown's wife, and found that Brown had failed to prove by a preponderance of the evidence that he had significant limitations in at least two adaptive functioning skills. Brown's case is not "a rare case that merits reversal, because the evidence is so convincing, barely controverted, and covers such a span of time." *Goodin*, 102 So. 3at 1113 (¶ 37). Giving the appropriate deference to the trial judge as the finder of fact and viewing the evidence in the light most favorable to the trial court's findings, the judge's findings were supported by the evidence presented and were not clearly erroneous.

### III. Whether the trial court erred by admitting Dr. Storer's report into evidence and by relying on certain statements therein.

¶40.    Brown claims that it was an abuse of discretion for the trial court to admit Dr. Storer's expert report into evidence because it contained inadmissible hearsay. He also asserts that the trial judge erroneously relied on statements about his substance abuse that were contradicted at the hearing and that the trial judge should not have relied on information in the report from individuals who did not testify at the hearing.

## A. Admissibility of Expert Reports

¶41. Brown asserts that expert reports are hearsay and, as a general rule, it is error to admit an expert report into evidence. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Miss. R. Evid. 801(c). Certainly, expert reports may contain statements from individuals not called to testify at trial, because an expert is allowed "to base his opinion on the opinions of others [that] are not in evidence so long as experts in the field ordinarily rely on such opinions in forming their own opinions." *Alexander v. State*, 759 So. 2d 411, 420 (¶ 30) (Miss. 2000) (quoting *Gray v. State*, 728 So. 2d 36, 56-57 (¶ 86) (Miss. 1998) (citing Miss. R. Evid. 703)).

¶42. Brown claims that the trial court erred by considering statements made to Dr. Storer by Albert Brown, Brown's father, and Constance Carter, Brown's high school girlfriend and the mother of two of his children. Brown argues that the statements were hearsay and that he did not have the opportunity to cross examine the individuals. Dr. Storer testified that he had interviewed both individuals, and he testified as to the information they provided, which largely pertained to Brown's work history. Both said that Brown drove a delivery truck and that he had a commercial driver's license. The statements in question were not offered "to prove the truth of the matter asserted." Rather, the statements were used to explain the basis of Dr. Storer's conclusions and opinions regarding Brown's work history. Thus, the statements were not hearsay. *See Flowers v. State*, 842 So. 2d 531, 559 (¶ 87) (Miss. 2003).

22

¶43.    Further, the weight and credibility of expert testimony is to be determined by the trier of fact. *Ladnier v. State*, 878 So. 2d 926, 931 (¶ 16) (Miss. 2004). When, as here, the finder of fact is faced with expert opinion testimony based on facts not within the personal knowledge of the expert, that the undergirding facts are not within the personal knowledge of the expert goes to the overall weight of the expert's opinions. *See McCaffrey v. Puckett*, 784 So. 2d 197, 203 (¶ 19) (Miss. 2001). Accordingly, it stands to reason that the finder of fact must be able to examine the underlying facts to make the necessary credibility determinations. To the extent the trial judge examined the testimony of nontestifying individuals, which was included in the expert's report and about which the expert testified at the hearing, to determine the credibility of Dr. Storer's expert opinion and the weight to give said opinion, we hold that the trial judge did not err.

¶44.    As to the admission of the report in general, Dr. Storer was called to testify and testified in detail about his report, his opinions, and the information gleaned from interviewing Brown's family and friends. Brown had a sufficient opportunity to cross-examine Dr. Storer. In a fact-intensive situation in which expert testimony is necessary, such as in determining mental retardation, the circuit judge could benefit from having the expert reports available after the hearing. The judge, noting that it was a bench trial with no jury, acknowledged the argument that expert reports contain hearsay and assured counsel that he would designate the portions of the report relied upon. The judge also admitted Dr. Zimmerman's expert report. "Our well-established standard of review for reviewing the trial court's admissibility of evidence, including expert testimony, is abuse of discretion." *Jones*

*v. State*, 918 So. 2d 1220, 1223 (¶ 9) (Miss. 2005) (citations omitted). Where the admission of the evidence did not result in prejudice to the accused, we will affirm the trial court. *Id.* There is no evidence that the trial judge relied on anything from Dr. Storer's report that was not presented at the hearing. We cannot say that admitting the report resulted in prejudice to Brown. Thus, we hold that the judge did not err in admitting the expert report in the instant case.

## B. Substance Abuse

¶45. Brown also asserts that the trial court relied on a statement in the expert report that Dr. Storer conceded at the *Atkins* hearing was not true as a basis for finding that Brown did not have a significant adaptive functioning deficit in the area of work. Brown is referring to the trial judge's conclusion that Brown's numerous jobs and failure to hold a job "could clearly be explained just as easily as a substance abuse problem as a mental retardation indicator." Brown claims that the judge improperly relied on the following statement from Dr. Storer's report: "Mr. Brown had occupational difficulties in that he was fired from several jobs. During our interview of him, however, he reported that he was usually fired as a result of substance use influencing his performance and not because he was unable to do the work." Brown claims that the judge improperly relied on the foregoing statement because, at the *Atkins* hearing, Dr. Storer said that statement was not true. The record does not support Brown's claim.

¶46.  At the hearing, Dr. Storer clarified that Brown did not say "I was fired for substance abuse." Rather, in response to Dr. Storer's question about why Brown stopped working for Miller and Budweiser, Brown's exact words were:

> I think, I think I quit the first time, got into it with supervisor the second time . . . got fired at Budweiser . . . guess my performance wasn't good enough . . . I was supposed to be a merchandiser . . . switching beer around . . . oldest stuff in the front . . . wasn't going to the stores (laughing) getting drunk!

The quote from Brown was in Dr. Storer's report and was read verbatim at the hearing. Dr. Storer also testified that Brown had told him "that many of his employments were [a]ffected by his substance use." Dr. Storer's statement in the report that "[Brown] reported that he was usually fired as a result of substance use influencing his performance and not because he was unable to do the work" was not contradicted by his testimony at the hearing. Certainly, Brown's own statement that he got fired because he was getting drunk instead of going to work indicates that he was fired because substance abuse influenced his performance.

¶47.  The experts and lay witnesses presented a significant amount of evidence about Brown's substance abuse, which began as early as age six or seven. The trial judge, as the finder of fact, who had the opportunity to hear all of the witnesses' testimony and review the evidence, could have determined that Brown's own admission that he was getting drunk instead of going to work, coupled with the testimony about his substance abuse, could have been a reason for his being fired. That determination could have been reached without the report being admitted into evidence, because Brown's quote was read verbatim at the hearing. There is no indication from the record that the trial judge relied on any statement that was not true or was improperly admitted into evidence.

25

¶48. The judge noted the possibility that Brown had a commercial driver's license, that Brown had received job training, and that there was no indication that Brown could not perform the functions of his jobs. Thus, it seemed more likely that substance abuse was the cause of his problems. Further, the judge stated that just because a person's having many jobs can be an indicator of a deficit in adaptive functioning does not mean it unequivocally establishes an adaptive functioning deficit. Where the evidence and testimony indicate that other causes for having many jobs are present, the court has the discretion to weigh all of the evidence and make that determination. The issue is without merit.

**Conclusion**

¶49. The trial judge heard the testimony, considered the testimony and evidence presented, followed the procedure established in *Chase*, and applied the correct legal standard for determining whether Brown was mentally retarded under *Atkins* and *Chase*. Giving deference to the trial judge as the finder of fact, we cannot say that his findings were clearly erroneous.

¶50. **AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., CHANDLER AND PIERCE, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, JJ. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J. LAMAR, J., NOT PARTICIPATING.**

**DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶51. I fully join Justice Kitchens's well-reasoned dissent which correctly finds that, under our currently existing *Atkins* standards, the trial court erred by finding that Sherwood Brown

26

is not intellectually disabled and exempt from execution. I write separately to express grave concern about whether, under our current *Atkins* standards, courts can fairly determine which offenders are constitutionally exempt from the death penalty.

¶52. In *Atkins*, the United States Supreme Court expressed very specific concerns about executing persons whose mental capacities are reduced to the extent that they present significant risks particular to the judiciary.[3] Such concerns include the risk of "false confessions;" a lesser ability on the part of the offender to "make a persuasive showing of mitigation in the face of the prosecutorial evidence of one or more aggravating factors;" reduced ability to "give meaningful assistance to their counsel;" and reduced ability to make good witnesses because "their demeanor may create an unwarranted impression of lack of remorse for their crimes."[4]

¶53. But rather than exempt from the death penalty persons whose reduced mental capacities are found by the jury to present these concerns, the *Atkins* Court simply exempted all persons who bear the mental health label "mentally retarded."[5] This Court then followed the Supreme Court's lead and adopted the mental health definition corresponding with that label, essentially leaving it to the mental health community to decide who does, and does not, qualify for execution under the Constitution.[6]

---

[3] *Atkins v. Virginia*, 536 U.S. 304, 317-21, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

[4] *Id.* at 318-21.

[5] *Id.* at 321.

[6] *Chase v. State*, 873 So. 2d 1013, 1027-28 (Miss. 2004).

¶54. My concern is that the mental health community—which has no responsibility to address the *Atkins* Court's constitutional concerns—continually changes the "mental retardation" label for reasons that bear no relationship to the *Atkins* Court's concerns. This eliminates any confidence of a connection between the continually changing label and the Court's actual concerns. This disconnect, for instance, would allow the mental health community to increase drastically the threshold for mental retardation, rendering the label incapable of addressing the Court's constitutional concerns. Further, not only do these definitions change over time, but so too has the label, from mental retardation to intellectual disability.[7]

¶55. My concern takes into account the fact that the mental health community recognizes at least two different definitions of intellectual disability; one produced by the American Association on Mental Retardation (AAMR), and another produced by the American Psychiatric Association (APA). The *Atkins* opinion—handed down in 2002—quoted the AAMR's 1992 definition of "mental retardation,"[8] presumably without knowing that the AAMR would, that very same year (2002), adopt a new definition.[9] The *Atkins* Court also quoted from the APA's fourth edition of its Diagnostic and Statistical Manual of Mental

---

[7] ***Hall v. Florida***, _ U.S. _, 134 S. Ct. 1986, 1990, 188 L. Ed. 2d 1007 (2014).

[8] ***Atkins***, 536 U.S. at 308 n.3 (quoting *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992)).

[9] *Mental Retardation: Definition, Classification, and Systems of Supports* (10th ed. 2002).

Disorders (DSM), produced in 2000.[10] The DSM's fifth edition, which contains still another new and different definition of intellectual disability, was released in 2013.[11] What is more, given the fact that these mental health standards change over time, this Court's decision to adopt the definition that existed in one snapshot in time—ignoring its perpetual change—made *the* definition from what was one of many definitions.

¶56. It seems to me that—rather than exempting from the death penalty all persons who bear the label "mentally retarded" as that label existed when we decided *Chase* or as continually defined, changed, and amended by persons who bear no duty or responsibility to meet the judiciary's constitutional concerns—we should consider a judicial definition of intellectual disability that directly addresses the constitutional concerns expressed by the *Atkins* Court. This, I believe, is what the *Atkins* Court invited us to do when it stated:

> Not all persons who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright*, 477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986), with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* at 399, 405, 416-417, 106 S. Ct. 2595.[12]

¶57. In implementing the *Ford* directive concerning insanity, the judiciary is unconcerned with the mental health community's various definitions of insanity, substituting instead a judicial definition, commonly known as the M'Naghten Rule, that is designed to meet the

---

[10] *Atkins*, 536 U.S. at 308 n. 3 (quoting *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. 2000)).

[11] *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).

[12] *Atkins*, 536 U.S. at 317.

concerns of the judiciary, rather than those of the mental health community.[13]  Were we to do the same for intellectual disability, we would be assured that at least the correct question is considered.

**KITCHENS AND KING, JJ., JOIN THIS OPINION**.

**KITCHENS, JUSTICE, DISSENTING:**

¶58.    After Sherwood Brown received a death sentence for capital murder, this Court granted him an evidentiary hearing to determine whether he is intellectually disabled[14] and, therefore, exempt from execution. In denying Brown relief, the circuit court applied the wrong legal standard. Now the majority perpetuates that error. Upon review of the evidence presented to the trial court, and applying the correct legal standard, I would find that Brown is intellectually disabled and ineligible for execution.

**I.       The circuit court applied an incorrect legal standard.**

¶59.    Brown argues that the circuit judge applied an incorrect legal standard for three reasons and that his factual findings should be given no deference. Specifically, he argues that the trial judge "turned the requirement that the onset of mental retardation be before age eighteen into an evidentiary requirement that only evidence from contacts before age eighteen may be used to prove adaptive functioning deficits . . . ." This concern about the

---

[13] ***Roundtree v. State***, 568 So. 2d 1173, 1179 (Miss. 1990).

[14] *Intellectually disabled* has replaced the term *mentally retarded* in the professional vernacular.  The United States Supreme Court has recognized this change.  ***Hall v. Florida***, _ U.S. _, 134 S. Ct. 1986, 1990, 188 L. Ed. 2d 1007 (2014).

trial court's application of the **Chase**[15] standard embodies two distinct disputes between the parties.

¶60.    First, the parties dispute whether the **Chase** standard requires the petitioner to present evidence that each adaptive functioning deficit manifested prior to age eighteen, or whether the petitioner need only provide evidence that the intellectual disability manifested in some way prior to the age of eighteen years. Second, the parties dispute whether the trial judge actually disregarded the results of Dr. Marc Zimmermann's Vineland adaptive functioning test because it was administered to Angela Brown, who did not know Brown prior to his attainment of the age of eighteen.

¶61.    The Vineland measures adaptive functioning in various aspects of life. Dr. Zimmermann administered the test to Angela because, according to a phenomenon called the Cloak of Competency, individuals tend to overestimate their own skills. Because a diagnosis of intellectual disability requires onset prior to age eighteen, the tested person should have known the subject person prior to his attainment of that age. Though Angela did not know Brown at that age, Dr. Zimmermann explained that he had asked Angela to answer the questions by thinking back as close to age eighteen as she had known Brown. Dr. Zimmermann opined that the Vineland results indicated that Brown had an adaptive functioning deficit in the area of communication.

¶62.    The trial court provided an in-depth analysis of the adaptive functioning areas. As he considered each area, the trial judge detailed the evidence supporting or refuting an adaptive

_____

[15]**Chase v. State**, 873 So. 2d 1013 (Miss. 2004)

31

functioning deficit in the particular area. But, before he engaged in that area-by-area analysis, the trial judge articulated some general principles about adaptive functioning deficits. There, he noted that Dr. Zimmermann had administered the Vineland test to Angela and stated "[h]e later admitted the test was recommended for someone who knew the person being evaluated before the age of 18, but that she only knew Brown after he was eighteen." The trial judge's order also noted the lack of "psychological testing before Brown was 18."

¶63.    The circuit judge appears not to have taken into account Dr. Zimmermann's Vineland test results, because Dr. Zimmerman had relied on information from times after Brown had become eighteen years of age. No other reading of the order is tenable in light of the trial judge's detailed analysis of the evidence he considered without a single mention of the Vineland. The majority disagrees, finding that "the judge mentioned Angela's testimony about Brown." But, while the judge mentioned Angela's qualitative testimony, his detailed review of the evidence omitted any reference to the quantitative results produced by the Vineland. To disregard this evidence was legal error.

¶64.    This Court adopted its *Chase* standard directly from two pieces of medical literature on intellectual disability. Each medical definition requires onset or manifestation prior to age eighteen. *Chase v. State*, 873 So. 2d 1013, 1027-28 (Miss. 2004) (quoting *Atkins v. Virginia*, 536 U.S. 304, 308 n.3, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (quoting *Mental Retardation: Definition, Classification, and Systems of Support* 5 (9th ed. 1992); *Diagnostic and Statistical Manual of Mental Disorders* 39 (4th ed. 2000))). In *Goodin v. State*, we noted that an expert may utilize any accepted test of adaptive functioning deficits, but that a

retrospective analysis is necessary to show onset prior to age eighteen. *Goodin v. State*, 102

So. 3d 1102, 1104 (Miss. 2012) (internal citations omitted). We stated:

> This Court has noted the importance of interviewing family and friends knowledgeable about the defendant's past. Interviews with educators or others in the community familiar with the defendant's behavior before age eighteen also would provide valuable information. Adaptive-functioning tests may be administered to these individuals as well. A retrospective evaluation also could include a thorough review of school records, social history, and work history, among other things.

*Id.* at 1115 (internal citations omitted). *Goodin* adopted that standard from the opinion of the

United States District Court for the Eastern District of Louisiana in *United States v. Hardy*.

*Id.* at 1114 (quoting *United States v. Hardy*, 762 F. Supp. 2d 849, 881-82 (E. D. La. 2010)).

In *Hardy*, the district court likewise required retrospective analysis, but stated:

> Certainly a person's level of adaptive functioning in the present might provide some information about his abilities during the developmental period as, all things being equal, a person without limitations in the present is less likely to have had limitations before, and a person with limitations today is more likely to have had them during the developmental period.

*Hardy*, 762 F. Supp. 2d at 881 (citing *American Association on Intellectual and*

*Developmental Disabilities*, 95-96 (11th ed. 2010) (relegating contemporary assessment to

a possible additional tool); *Id.* at 46 (noting retrospective diagnosis requires evaluation of

subject's "previous functioning")). So the onset requirement necessitates a retrospective

analysis to before age eighteen. However, evidence from after age eighteen still carries

probative value. The trial judge converted the requirement that some evidence show

manifestation before age eighteen into a requirement that the petitioner utilize only evidence

from events and circumstances before age eighteen. By so doing, he applied the wrong legal

33

standard and his factual findings are entitled to no deference. ***Neal v. State***, 687 So. 2d 1180, 1187 (Miss. 1996). And this error infects the circuit judge's consideration of criteria B and C because the quantitative evidence produced by the Vineland was relevant to establish adaptive functioning deficits and manifestation prior to age eighteen.

¶65.    Because the trial judge failed to apply the correct legal standard, I would review his factual findings *de novo*. ***Id.***

## II.    The circuit court's ruling ignores the overwhelming weight of the evidence.

¶66.    Brown bore the burden of proving by a preponderance of the evidence that he had "(1) subaverage intellectual functioning (2) accompanied by significant limitations in at least two adaptive skills (3) that manifest before age eighteen." ***Goodin***, 102 So. 3d at 1104 (citing ***Atkins***, 536 U.S. at 318; ***Chase***, 873 So. 2d at 1027-28). He also had to show that he was not malingering. ***Chase***, 873 So. 2d at 1029. Reviewing the evidence *de novo*, I would find that Brown met his burden.

¶67.    The State conceded the subaverage intellectual functioning—both experts agreed Brown had a seventy-five IQ—and malingering elements during the evidentiary hearing. So the only question before this Court is whether Brown established two or more adaptive functioning deficits, and that they manifested prior to age eighteen, by a preponderance of the evidence.

### *Functional Academics*

¶68.    June Gilbreath taught Brown in sixth grade and was tasked with filling out his academic transcript that year. She testified about her experience with Brown as a student and

explained the information contained in his transcript. Much of her testimony centered on a handwritten "LD" notation on Brown's transcript, which Gilbreath said that she wrote. She testified that the notation indicated that Brown was "learning disabled" or had a "learning disability."

¶69.    The trial judge found that the State refuted this evidence with the testimony of Susan Kizer. She reviewed Brown's transcript and testified that "SLD" is the correct way to denote a learning disability. She also stated that "LD" was not a customary way to acknowledge that a student was learning disabled. Additionally, she explained that a student would not be labeled learning disabled except upon completion of a comprehensive evaluation. But she testified that a transcript may or may not indicate whether a student was enrolled in special education and that school records from the time Brown attended have been destroyed. She also admitted that she had no personal knowledge about Brown.

¶70.    In the past, we have noted the importance of the fact that the petitioner's evidence was "barely controverted" by the State's evidence when reversing a trial judge's finding that the petitioner is not intellectually disabled. *Goodin*, 102 So. 3d at 1113. Susan Kizer's testimony does not refute Gilbreath's testimony that Brown had been identified as learning disabled. Though she testified that "SLD" is the appropriate notation, she did not testify that no teacher ever would use "LD." She admitted that she lacked  personal knowledge about Brown. And the fact that a learning disability needed to be determined through a comprehensive evaluation is of no consequence because she could not testify to any personal knowledge that Brown never had such an evaluation and could not produce any record to support such a

35

conclusion. Kizer's testimony, at most, reflects an opinion that Gilbreath used an incorrect notation on Brown's transcript.

¶71. Gilbreath also explained that Brown struggled academically in the first through fifth grades, but that his grades improved because they were "modified," meaning Brown was given easier material and tests than other students received. Gilbreath explained that this practice continued in the eighth grade, where Brown also received higher grades. She also testified that Brown repeated the first grade, received "social promotions" because of his size in the fourth and fifth grades despite failing grades, and spent a year and a half in the seventh grade before being promoted to the second semester of the eighth grade.

¶72. The State's expert, Dr. Storer, noted that the fact that Brown failed the first grade was of particular concern because failing early grades indicates more severe problems. He opined that an adaptive functioning deficit in functional academics was belied by the fact that Brown passed numerous grades. But Dr. Storer's opinion failed to account for Gilbreath's undisputed testimony that Brown's grades were modified and that he received multiple social promotions.

¶73. Dr. Storer also cited Brown's standardized test scores, which advanced from year to year. Gilbreath explained those scores. She noted that in the fifth grade, Brown had achieved only a second-grade reading level and a third-grade math level. In sixth grade, he had a third-grade reading level and a fourth-grade math level. She explained that Brown struggled despite giving his best effort in school. Finally, Dr. Zimmermann opined, based on this information, that Brown had a significant adaptive functioning deficit in the area of

functional academics. He explained that it is common for schools to label a child learning disabled rather than to assess for intellectual disability.

¶74. The overwhelming, barely controverted evidence shows that Brown struggled significantly in school and that his successes were the result of decreasing standards and social promotions. That is to say, even when Brown advanced, he did not do so based on his ability. The State failed to refute this evidence in any substantial way. *Goodin*, 102 So. 3d at 1113. Finally, Brown's expert opined that he possessed an adaptive functioning deficit in this area. Applying a *de novo* review, I would find that Brown established an adaptive functioning deficit by a preponderance of the evidence.

¶75. Further, because all of the evidence of this deficit relates to a time before Brown turned eighteen, Dr. Zimmermann opined that this established manifestation prior to age eighteen. That conclusion is not contradicted by the evidence. So the manifestation element is satisfied with respect to this deficit.

*Communication*

¶76. Dr. Zimmermann opined that Brown has a significant adaptive functioning deficit in the area of communication. Dr. Zimmermann based that conclusion on the Vineland test, which the trial judge failed to consider. That test revealed that Brown's age equivalence for receptive speech was three years, seven months; expressive speech, seven years, six months; written communication, ten years, zero months. And Gilbreath noted that, in the fifth grade, Brown had a second-grade reading level and in sixth grade, a third-grade reading level based on standardized test scores.

¶77. Likewise, Dr. Storer administered the Wide Range Achievement Test (WRAT) and concluded that Brown currently possesses a word-reading ability just below a ninth-grade level and a sentence comprehension ability at the seventh-grade level. And the only evidence to refute Brown's deficit in this area was that Dr. Storer noted that Brown's ability to care for his children and take them to the doctor suggested, but did not establish, that Brown possessed good communication skills. This left Brown's evidence "barely controverted." *Id.*

¶78. I also would find that Brown proved an adaptive functioning deficit in communication by a preponderance of the evidence. The State simply failed to refute Dr. Zimmermann's findings in this area. And, like functional academics, this deficit manifested prior to age eighteen as evidenced by the standardized test scores in Brown's academic transcript and June Gilbreath's testimony.

¶79. Because the State conceded the subaverage intellectual functioning and malingering elements, and because Brown proved adaptive functioning deficits in functional academic skills and communication which manifested prior to age eighteen by a preponderance of the evidence, I would find that he is intellectually disabled under our *Chase* standard.

**DICKINSON, P.J., AND KING, J., JOIN THIS OPINION.**